## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: | § § § | CASE NO: 24-11535 |
| RISE MANAGEMENT, LLC, | § § | CHAPTER 11 |
| DEBTOR. | § § § | SECTION A |

## CONFIRMATION ORDER

The Court held a confirmation hearings on August 5, 2025, and October 17, 2025, (together, the "Confirmation Hearing") to consider the *Chapter 11 Plan of Reorganization of the Debtor*, [ECF Doc. 138], as amended, [ECF Docs. 153, 207, 220, 245, 247, & 267], (the "Plan"); and the objection to the Plan (the "Objection"), [ECF Doc. 242], filed by David W. Asbach, Acting United States Trustee for Region 5 (the "UST"); and this Court's *Order To Show Cause* dated August 14, 2025, [ECF Doc. 257], (the "OSC") ordering the Debtor to appear and show cause as to why this case should not be dismissed for cause, including the inability to effectuate a confirmable plan of reorganization.  A copy of the Plan is attached to this Order as **Exhibit 1**.

At the Confirmation Hearing, counsel for the UST orally withdrew its Objection, and the Court admitted: (i) the *Declaration of Joshua L. Bruno, Member of Rise Management, LLC, in Support of Second Amended Combined Plan and Disclosure Statement* (Debtor Ex. 1), [ECF Doc. 270]; (ii) the *Declaration of Cullan Maumus, Manager of Rise Management, LLC, in Support of Second Amended Combined Plan and Disclosure Statement* (Debtor Ex. 2), [ECF Doc. 271]; and (iii) the *Declaration of Janice Bruno, Trustee of the Janice Bruno Irrevocable Trust* (Debtor Ex. 3), [ECF Doc. 269], (collectively, the "Declarations").

Accordingly, based upon the evidence, the applicable law, and the record and pleadings, including the *Tabulation of Voting*, [ECF Doc. 251], the Court makes the following findings of

fact and conclusion of law pursuant to Rules 7052 and 9014 of the Federal Rules of Bankruptcy Procedure:

## FINDINGS OF FACTS & CONCLUSIONS OF LAW

A.      <u>Jurisdiction</u>.  The Court has jurisdiction over this matter under 28 U.S.C. § 1334. This matter is a core matter that this Court can hear and determine on a final basis under 28 U.S.C. § 157(b)(2).

B.      <u>Venue</u>.  Venue before the Court is proper under 28 U.S.C. §§ 1408 and 1409.

C.      <u>Immaterial Modifications</u>.  The Court finds that the modifications to the Plan, [ECF Docs. 245, 247, & 267], are nonmaterial within the meaning of Federal Rule of Bankruptcy Procedure 3019, and the Debtor is not required to resolicit votes on the Plan.

D.      <u>Notice</u>.  Due, adequate, and sufficient notice of the Plan, solicitation package, and this Court's Orders setting the Confirmation Hearing, [ECF Docs. 222 & 259], were served upon all creditors, interest holders, and parties requesting notice along with a copy of the Plan, as evidenced by the *Certificate of Service* filed on May 22, 2025, and August 15, 2025, [ECF Docs. 223 & 260].  The method of service and solicitation of acceptance of the Plan, notice of the hearing to consider confirmation of the Plan, and notices of all other deadlines or requirements relating thereto (collectively, the "<u>Confirmation Deadlines</u>") comply with the Federal Rules of Bankruptcy Procedure, are adequate and reasonable under the circumstances of this case, and no further or additional notice of the Confirmation Hearing or the Confirmation Deadlines are necessary or required.

E.      <u>Proper Classification of Claims – 11 U.S.C. §§ 1122 and 1123</u>.  The Plan adequately and properly identifies and classifies all claims.  Pursuant to 11 U.S.C. § 1122(a), the

claims placed in each class are substantially similar to other claims in each such class. The classification of claims in the Plan is reasonable.

F.     Specified Unimpaired Classes – 11 U.S.C. § 1123(a)(2). The Plan specifies all classes or claims that are not impaired under the Plan.

G.     Specified Treatment of Impaired Classes – 11 U.S.C. § 1123(a)(3). The Plan specifies the treatment of all classes of claims that are impaired under the Plan.

H.     No Discrimination – 11 U.S.C. § 1123(a)(4). The Plan provides for the same treatment of claims or interests in each respective class unless the holder of a particular claim or interest has agreed to a less favorable treatment of such claim or interest.

I.     Implementation of the Plan – 11 U.S.C. § 1123(a)(5). The Plan provides adequate means for its implementation. The Debtor will act as the post-confirmation disbursement agent.

J.     Non-Voting Equity Securities/Allocation of Voting Power – 11 U.S.C. § 1123(a)(6). This provision is not applicable because the Debtor has not issued any non-voting equity securities.

K.     Interest of Creditors, Equity Security Holders, and Public Policy – 11 U.S.C. § 1123(a)(7). This provision is not applicable because the Debtor has not issued any non-voting equity securities.

L.     Payments to Creditors from Earnings from Personal Services – 11 U.S.C. § 1123(a)(8). This provision is not applicable because the Debtor is not an individual.

M.     Assumption and Rejection – 11 U.S.C. § 1123(b)(2). The Plan, pursuant to 11 U.S.C. § 365, provides for the assumption, rejection, or assignment of any executory contract or unexpired lease of the Debtor not previously rejected.

N. <u>Additional Plan Provisions – 11 U.S.C. § 1123(b)(6)</u>. Each of the provisions of the Plan is appropriate and not inconsistent with the applicable provisions of the Bankruptcy Code.

O. With respect to the relevant provisions of 11 U.S.C. § 1129(a), the Court finds and concludes as follows:

a) <u>11 U.S.C. § 1129(a)(l)</u>. The Plan incorporates the requirements of 11 U.S.C. §§ 1122 and 1123, governing classification and contents of the Plan. Further, the Debtor has provided adequate means for the Plan's implementation, thereby satisfying 11 U.S.C. § 1123(a)(5).

b) <u>11 U.S.C § 1129(a)(2)</u>. The Debtor has complied with the applicable provisions of the Bankruptcy Code.

c) <u>11 U.S.C. § 1129(a)(3)</u>. The Plan was proposed in good faith and not by any means forbidden by law.

d) <u>11 U.S.C. § 1129(a)(4)</u>. The Debtor shall not make any payments for services or for costs and expenses in or in connection with the case or the Plan until such time as such request for payment has been approved by the Court as reasonable.

e) <u>11 U.S.C. § 1129(a)(5)</u>. The Plan provides for post-confirmation management of the Debtor.

f) <u>11 U.S.C. § 1129(a)(6)</u>. This provision deals with government regulatory commissions and is inapplicable herein.

g) <u>11 U.S.C. § 1129(a)(7)</u>. The Plan provides that, with respect to each impaired class of claims, each holder of a claim has accepted the Plan, or will receive or retain under the Plan on account of such claim or interest property of a value, as of the Plan Effective Date, that is not less than the amount that such holder would so receive or retain if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code.

h) <u>11 U.S.C. § 1129(a)(8)</u>. The Plan satisfies 11 U.S.C. § 1129(a)(8) as classes 2, 3, and 5 are impaired and accepted the Plan.

i) <u>11 U.S.C. § 1129(a)(9)</u>. The Plan satisfies 11 U.S.C. § 1129(a)(9) and no objection has been filed that the Plan does not comply with this section.

j) <u>11 U.S.C. § 1129(a)(10)</u>. The Plan satisfies 11 U.S.C. § 1129(a)(10) as classes 2, 3, and 5 are impaired and accepted the Plan.

k) <u>11 U.S.C. § 1129(a)(11)</u>. Confirmation of the Plan is not likely to be followed by liquidation, or the need for further financial reorganization by the Debtor. The Declarations support that this requirement for Plan confirmation has been satisfied.

l)      <u>11 U.S.C. § 1129(a)(12)</u>.  The Plan provides for the payment of fees that are required to be paid to the U.S. Trustee under 28 U.S.C. § 1930.

m)      <u>11 U.S.C. § 1129(a)(13)</u>.  This provision is inapplicable herein as the Debtor pays no retiree benefits.

n)      <u>11 U.S.C. § 1129(a)(14)</u>.  This provision is inapplicable because the Debtor has no domestic support obligations.

o)      <u>11 U.S.C. § 1129(a)(15)</u>.  This provision is inapplicable because the Debtor is not an individual.

p)      <u>11 U.S.C. § 1129(a)(16)</u>.  This provision is not applicable herein as there is no contemplated transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.

Accordingly,

**IT IS ORDERED** that:

1.      The Plan is **CONFIRMED** pursuant to 11 U.S.C. § 1129(a).

2.      The OSC is **SATISFIED**.

3.      <u>Binding Effect of Plan</u>.  Pursuant 11 U.S.C. § 1141(a), the provisions of the Plan, as of the Effective Date, bind the Debtor and any creditor, whether or not the claim or interest of such creditor is impaired under the Plan and whether or not such creditor has accepted the Plan.

4.      <u>Revesting of Property</u>.  Pursuant to 11 U.S.C. § 1141(b), except as otherwise provided in the Plan or in this Confirmation Order, all the property of the estate vests in the Debtor as of the Plan Effective Date.  Except as provided in 11 U.S.C. §§ 1141(d)(2) and (3) and except as otherwise provided in the Plan or in this Order, after confirmation of the Plan, the property dealt with by the Plan is free and clear of all claims and interests of creditors.

5.      <u>Post-Confirmation Operation of Business</u>.  Except as otherwise provided in the Plan or in this Confirmation Order, on and after the Effective Date, the Debtor may operate a business and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code and Bankruptcy Rules and in all respects as if there were no pending case under any chapter or

provisions of the Bankruptcy Code.  The Debtor is entitled to retain and compensate professionals without the necessity of further approval of this Court.  Except as set forth in the Plan concerning objections to claims, the Debtor may also settle or compromise any claims without Court approval.

6.     Injunction and Discharge.  Except as otherwise expressly provided in the Plan or in this Order, as of the Effective Date, (i) the Debtor shall be discharged from any debt to the fullest extent provided by 11 U.S.C. § 1141(d)(1), and (ii) all holders of any discharged claims against the Debtor are enjoined from enforcing any such claim to the fullest extent provided by 11 U.S.C. § 524(a).

7.     Effect of Confirmation Order on Plan.  The failure to reference or address all or part of any particular provision of the Plan herein has no effect on the validity, binding effect, or enforceability of such provision and such provision has the same validity, binding effect, and enforceability as every other provision of the Plan.  To the extent that any inconsistencies exist between the terms of the Plan and this Confirmation Order, the terms of this Confirmation Order shall control.

8.     Executory Contracts and Leases.  Except as otherwise provided in a separate Order of the Court, all executory contracts and unexpired leases not otherwise assumed are deemed assumed as of the Effective Date.  Notwithstanding the foregoing, health insurance benefit agreements with insurance providers are not considered executory contracts and remain effective between the Debtor and the provider.

9.     Jurisdiction.  The Bankruptcy Court shall retain jurisdiction to:

a)     Hear any matter arising under the Bankruptcy Code;

b)     Hear and determine any and all objections to the allowance of claims or existing equity interests;

c) Hear and determine any and all motions to estimate claims at any time, regardless of whether the claim to be estimated is the subject of a pending objection, a pending appeal, or otherwise;

d) Hear and determine any and all motions to subordinate claims or existing equity interests at any time and on any basis permitted by applicable law;

e) Hear and determine all administrative expense claims;

f) Hear and determine all matters with respect to the assumption or rejection of any executory contract or unexpired lease to which a Debtor is a party or with respect to which a Debtor may be liable, including, if necessary, the nature or amount of any claim or required cure cost or the liquidation of any claims arising therefrom;

g) Hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to, this Chapter 11 case;

h) Enter such Orders as may be necessary or appropriate in aid of the consummation hereof and to execute, implement, or consummate the provisions hereof and all contracts, instruments, releases, and other agreements or documents created in connection with this Plan, the disclosure statement, [ECF Doc. 220], or the Confirmation Order;

i) Hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of this Plan and all contracts, instruments, and other agreements executed in connection with this Plan;

j) Hear and determine any request to modify this Plan or to cure any defect or omission or reconcile any inconsistency herein or any Order of this Court;

k) Issue and enforce injunctions or other Orders, or take any other action that may be necessary or appropriate to restrain any interference with or compel action for the implementation, consummation, or enforcement hereof or the Confirmation Order;

l) Enter and implement such Orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

m) Hear and determine any matters arising in connection with or relating hereto, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with this Plan, the disclosure statement, [ECF Doc. 220], or the Confirmation Order;

n) Enforce all Orders, judgments, injunctions, releases, exculpation, indemnification, and rulings entered in connection with the Chapter 11 case;

o) Recover all assets of the Debtor and property of the estate, wherever located;

p)      Hear and determine matters concerning state, local, and federal taxes in accordance with 11 U.S.C §§ 346, 505, and 1146;

q)      Issue such Orders in aid of execution of this Plan to the extent authorized by 11 U.S.C. § 1142;

r)      Hear and determine all disputes involving the existence, nature, or scope of the Debtor's discharge and any releases or exculpations under this Plan;

s)      Hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code; and,

t)      Enter a final decree closing the above-captioned case.

10.   <u>Documents Required To Effectuate Plan</u>.  The Debtor is authorized to execute any and all documents reasonably required to effectuate the provisions of the Plan or prior Orders of this Court.

**IT IS FURTHER ORDERED** that the Debtor shall serve this Order via first-class U.S. Mail on the required parties who will not receive a copy through the Court's CM/ECF system pursuant to the Federal Rules of Bankruptcy Procedure and this Court's Local Rules and file a certificate of service to that effect within three (3) days.

New Orleans, Louisiana, November 5, 2025.

_____
      MEREDITH S. GRABILL
    UNITED STATES BANKRUPTCY JUDGE

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re: | § | Case No. 24-11535 |
| | § | |
| Rise Management, LLC | § | Chapter 11 |
| | § | |
| Debtor | § | Section "A" |

**RISE MANAGEMENT, LLC'S SECOND AMENDED COMBINED PLAN
AND DISCLOSURE STATEMENT DATED OCTOBER 15, 2025**

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................... 3
II. PURPOSE OF THE PLAN ............................................................................................ 3
III. GENERAL OVERVIEW AND BACKGROUND INFORMATION ............................... 4
   A.  BACKGROUND AND GENERAL INFORMATION ................................................ 4
   B.  EVENTS LEADING TO THE CHAPTER 11 CASE ................................................ 6
   C.  SIGNIFICANT POST-PETITION EVENTS ......................................................... 7
   D.  VALUATION OF THE DEBTOR'S ASSETS ...................................................... 12
   E.  FINANCIAL FORECAST OF THE DEBTOR ..................................................... 12
IV. PLAN OF REORGANIZATION AND TREATMENT OF CLAIMS/INTERESTS .... 13
   A.  TREATMENT OF CLAIMS AND INTERESTS ................................................... 14
   B.  CLASSIFICATION OF CLAIMS. ................................................................... 14
   C.  CLAIMS UNDER THE PLAN ....................................................................... 14
   D.  PROVISIONS FOR PAYMENT OF UNCLASSIFIED CLAIMS ................................ 17
   E.  EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..................................... 19
V. MEANS OF IMPLEMENTATION OF THE PLAN ...................................................... 20
   F.  CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES .................................. 22
   G.  METHOD OF DISTRIBUTIONS UNDER THE PLAN. ........................................... 23
   H.  ADMINISTERING CLAIMS. ........................................................................ 26
   I.  TIME BAR TO CASH PAYMENTS. ............................................................... 28
   J.  ALLOCATION OF PLAN DISTRIBUTION BETWEEN PRINCIPAL AND INTEREST. ...... 28
   K.  EFFECT OF CONFIRMATION OF THE PLAN ................................................... 28
   L.  CLAIMS AGAINST OTHERS ....................................................................... 30
   M.  CLAIMS AGAINST INSIDERS AND RELATED PARTIES .................................... 30
VI. LITIGATION .............................................................................................................. 31
VII. LIQUIDATION ANALYSIS UNDER CHAPTER 7 ................................................... 32
VIII. CONFIRMATION PROCEDURE ............................................................................ 33
   A.  VOTING AND OTHER PROCEDURES ........................................................... 33
   B.  DISCLAIMERS AND ENDORSEMENTS .......................................................... 35
   C.  THE CONFIRMATION HEARING .................................................................. 35
   D.  CONFIRMATION ...................................................................................... 36
   E.  UNFAIR DISCRIMINATION AND FAIR AND EQUITABLE TESTS .......................... 36
   F.  FEASIBILITY ........................................................................................... 37

G. BEST INTEREST TEST ........................................................................................... 37
H. CERTAIN RISK FACTORS TO BE CONSIDERED ....................................................... 38
I. CERTAIN BANKRUPTCY CONSIDERATIONS .............................................................. 38

**IX. RETENTION OF JURISDICTION** ........................................................................... **39**
**X. MISCELLANEOUS PROVISIONS** ............................................................................. **40**
A. HEADINGS; DESCRIPTIONS. ................................................................................. 40
B. TAX REPORTING REQUIREMENTS. ......................................................................... 40
C. NO TRANSFER TAX. ........................................................................................... 40
D. SECTION 1145 EXEMPTION. ................................................................................ 41
E. EXPEDITED TAX DETERMINATION. ....................................................................... 41
F. INCONSISTENT TERMS; CONTROLLING DOCUMENT. ............................................... 41
G. SEVERABILITY OF PLAN PROVISIONS. ................................................................... 42
H. SUCCESSORS AND ASSIGNS. ................................................................................ 42
I. BINDING EFFECT. ............................................................................................... 42
J. REVOCATION, WITHDRAWAL, OR NON-CONSUMMATION. ....................................... 42
K. NOTICES. ......................................................................................................... 43
L. GOVERNING LAW. ............................................................................................. 43
M. PREPAYMENT. ................................................................................................... 43
N. SECTION 1125(E) OF THE BANKRUPTCY CODE. ..................................................... 43
O. EXHIBITS/SCHEDULES. ....................................................................................... 44
P. ENTIRE AGREEMENT. ......................................................................................... 44

# I. INTRODUCTION

This is the combined Plan and Disclosure Statement (for ease of reference, the combined Plan and Disclosure Statement will be referred to as the "Plan") in the Chapter 11 case Rise Management, LLC ("Debtor" or on and after the Effective Date of the Plan, the "Reorganized Debtor"). This Plan is filed under chapter 11 of the Bankruptcy Code (the "Code") and proposes to pay creditors of the Debtor from cash flow from operations, an infusion of capital, litigation proceeds, and sale of assets. This Plan provides for three classes of secured claims; one class of unsecured claims; and one class of equity security holders. Unsecured creditors holding allowed claims will receive distributions, which the Debtor has valued at approximately 13.6 cents on the dollar.

All creditors and equity security holders should refer to Article IV of this Plan for information regarding the precise treatment of their claims. This Plan also provides detailed information regarding the terms for payment of the Debtor's creditors and other information designed to assist creditors and equity security holders in determining whether to accept the Plan. **Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one. (If you do not have an attorney, you may wish to consult one.)**

For purposes of this Plan and any subsequent amendments or modifications hereof, the terms set forth in the Uniform Glossary of Defined Terms attached as **Exhibit 1** shall have the meanings set forth therein, and any term used herein, which is defined in the Bankruptcy Code but not defined herein, shall have the meaning set forth in the Bankruptcy Code.

# II. PURPOSE OF THE PLAN

This Plan describes:

• The Debtor and significant events during the bankruptcy case.
• Historical information regarding the Debtor and the events leading to its bankruptcy filing.
• How the Plan proposes to treat claims or equity interests of the type you hold (i.e., what you will receive on your claim or equity interest if the Plan is confirmed).
• Who can vote on or object to the Plan.
What factors the Bankruptcy Court will consider when deciding whether to confirm the Plan.
• Why the Debtor believes the Plan is feasible, and how the treatment of your claim or equity interest under the Plan compares to what you would receive on your claim or equity interest in liquidation.
• The effect of confirmation of the Plan.

The primary purpose of the Plan is to reorganize the Debt of the Debtor and make distributions to Holders of Allowed Claims.

### III. GENERAL OVERVIEW AND BACKGROUND INFORMATION

**A. <u>BACKGROUND AND GENERAL INFORMATION.</u>**

**1. Overview and Background of the Debtor**

The Debtor was founded in 2012. Its primary assets are three (3) retail/office/restaurant buildings and related improvements located in New Orleans, Louisiana (hereinafter, collectively referred to as the "<u>Properties</u>") which sit on three separate lots, with all utilities, services, and parking separated per lot. The three parcels, two with buildings and one with raw land, were acquired in December 2014 for the amount of $1,200,000.00.

The Debtor owns an approximately 2000sf building located at 3301 General DeGaulle Drive that is suitable for a restaurant, bar, quick service retail, or bank. This building was constructed by the Debtor and became operational in 2016. It is currently unoccupied due to a large tenant defaulting on its lease, with a collectable action pending.

The Debtor also owns an approximately 4000sf building located at 3321 General DeGaulle Drive that is suitable for retail and can hold up to 4 tenants. This property was built in approximately 2012. A lease has been signed for a unit in this building, and the Debtor has had multiple showings with high interest.

Finally, the Debtor owns an approximately 7000sf building located at 3361 General DeGaulle Drive that is suitable for office/retail and can hold 6-12 tenants. This property was built in approximately 2013. The building is partially occupied but has lost long standing tenants since BOA and their keeper failed to operate and maintain basic common elements or management of site.

The three buildings received repair and renovation updates. A description of the completed work can be found in **<u>Exhibit 2</u>**. All repairs to the buildings from storm and tenant move out damage as well as the Keeper's failure to maintain the property are completed and were funded by Equity Holders.

The Debtor made several renovations, including ground up construction and development of the Property since purchasing the parcels. When the Property was acquired by the Debtor, the building had numerous tenants with gross leases that were not cashflow positive. After renovating and updating the spaces, the Properties were re-leased to national and regional tenants such as pharmacies, chain restaurants, a national construction team, and national tax service chain. The Debtor's design and development team made the Properties into a historically stable and successful operating retail, office, and restaurant plaza. The redesign of the Property allowed for the addition of parking spots, increasing the available parking from 14 to 40 spaces. The value of the Property is primarily derived from cashflow and cap rate, which BOA's appraiser conservatively placed at 8.5%, was previously appraised in excess of $1,800,000.00. That value as well as the Debtor's successful operation over many years is what led to BOA financing the Property and later renewing the loan in 2022.

Prior to multiple hurricanes and an extremely depressed business environment due to COVID protocols, the tenants were comprised of a law office, title company, hair salon, pharmacy, waxing and make-up aesthetician, accountant, tax service, security company, and dine-in restaurants which primarily served the local business community. COVID and governmental restrictions decimated the tenants' businesses operations. The Debtor attempted to work out payment plans with the tenants while covering the negative cash flow. Despite the negative cash flow, the Debtor continued to make timely payments to BOA. After multiple tenants were unable to recover their businesses, they could not continue to pay rent. As a result, the Debtor faced a greater deficit in cash flow during this time period that forced the Debtor to cut back on preventative maintenance and annual improvement budgets (which BOA was briefed upon and accepted knowingly).

Since acquiring the Properties, the Debtor restructured its lease agreement to have all pass-through triple net ("NNN") fees, which protect Creditors and ownership, for variable expenses outside their control pass directly through to tenant operators. Prior to the change of lease terms, the Debtor's leases were gross-rent leases, which left the Debtor liable for unexpected expenses associated with the Property.

The Debtor also received special approval to place four lighted pylon signs for tenants to use for high visibility from the busy General DeGaulle corridor. The Property is located in a prime retail corridor with excellent co-tenancy and high demand/ high traffic tenants.

When past tenants leased space, they were given per square foot discounts in base rent as site was going under renovation and redesign and lease up. Those discounts will not be required with 2nd generation spaces now in place. The Debtor has renovated and designed raw spaces into finished rent-ready units with new mechanical, electrical and plumbing systems. With the updated design, a much higher base rent will be commanded for new occupancy, and speed of occupancy for new prospects touring the Property daily will also increase.

The Debtor's cashflow is derived from the collection of rents of the units on the Property, building and designing units, management fees, leasing fees, and property maintenance. The new LED lighting, signage, large store front wrap-around glass, landscaping, and re-designed parking layout, are proven successes and attractive to operators and tenants.

## 2. Organization and Capital Structure

Rise Management, LLC is a Louisiana limited liability company domiciled in New Orleans, Louisiana. Its members are Mercury Capital, LLC (94%), Janice Bruno Irrevocable Trust (5%), and Joshua Bruno (1%). Cullan Maumus, through MagNOLA Ventures, LLC, is the manager of the Debtor. Mr. Maumus has approximately twenty years' experience in the management and development of over 70 residential and commercial projects and developments in Louisiana and Texas. He also has vast experience in redevelopment of historic and storm damaged properties and is a regional expert in commercial real estate development, position, leasing and sale. The projects have ranged from $300,000.00 to $60,000,000.00.

### 3. The Debtor's Debt Structure

The Debtor's Debt Structure is as follows:

>   Bank of America, N.A. Secured Claim - $1,389,433.83[1]
>   Capital Advisors Secured Claim– $1,404,677.00
>   Property Tax Claims - $33,187.23
>   General Unsecured Claims - $277,857.02

## B. EVENTS LEADING TO THE CHAPTER 11 CASE

Due to the loss of multiple tenants, the Debtor was unable to remain current on its obligations to BOA. On October 30, 2023, BOA sent a Notice of Default to Rise Management claiming monetary defaults beginning August 1, 2023, and other non-monetary defaults. The Debtor and BOA negotiated a forbearance agreement in November 2023. However, due to a change in the terms and multiple delays by BOA, the forbearance agreement was never finalized and executed. When Rise Management was unable to cure the alleged defaults, a *Petition for Executory Process* was filed by BOA on February 20, 2024, in the Civil District Court for the Parish of Orleans, Case #2024-01461 ("Foreclosure"), seeking to appoint a keeper and ultimately foreclose on the Property.

In February 2024, BOA sent letters to all tenants demanding all future rent payments be sent to BOA. A keeper was appointed on June 5, 2024, and the Debtor was not allowed access to the Property. After BOA began collecting rent, multiple tenants departed due to not wanting to work with BOA or the Keeper. The tenants, Colistic Pharmacy, Vixen Development, and Crescent Coast Tattoo, despite previously exercising options extending the lease, moved out and defaulted on their leases.

A leak from a hot water heater and walk-in refrigerator/freezer drain line occurred during the Keeper's control of the Property. The leak was not addressed by the Keeper. Also, the Keeper and BOA ceased all landscaping, trash pickup, and janitorial operations at the site. The neglect of the Property required Debtor to repair, re-clean and pick up items. Several windows were broken, and multiple exterior air conditioning units were stolen while the Keeper was in control of the Property. BOA denies any neglect of the Property while the Keeper was in control. With trash and debris strewn about, cancelled regular maintenance such as window cleaning and bi-annual pressure washing, initial lease tours were challenging as potential tenants were not willing to pay market rate pricing. As a result of the Debtor and BOA's inability to resolve the issues raised in the Foreclosure, the Debtor was forced to seek chapter 11 relief.

The Property was sold at tax sales for 2023 and 2024. The Debtor will redeem the Property in accordance with Louisiana Constitution Article 7, Section 25(B).

---

[1] Per Proof of Claim #2 filed by BOA

### C. SIGNIFICANT POST-PETITION EVENTS

On August 7, 2024 (the "Petition Date"), the Debtor filed for relief under Chapter 11 of the Bankruptcy Code. The Debtor continues to manage its affairs as Debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

#### 1. Continuation of Business; Stay of Litigation

Following the Petition Date, the Debtor has continued to operate as Debtor-in-possession with the protection of the Bankruptcy Court. The Bankruptcy Court has certain supervisory powers over the Debtor's operations during the pendency of the Chapter 11 Case, including the power to approve any transactions that are outside the ordinary course of the Debtor's business. An immediate effect of the filing of a bankruptcy case is the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoins the commencement or continuation of all litigation against the Debtor. This injunction will remain in effect until the Effective Date unless modified or lifted by order of the Bankruptcy Court.

#### 2. Compliance with Bankruptcy Code, Bankruptcy Rules, Local Court Rules, and U.S. Trustee Deadlines.

On August 7, 2024, the Debtor filed the Statement of Financial Affairs and the Schedule of Assets and Liabilities. According to the Schedules, on the Petition Date the Debtor had assets totaling $2,628,537.02 and liabilities of $2,952,920.47. On September 9, 2024, the first meeting of creditors was held. The Debtor is current on the filing of all monthly reports and payments of quarterly fees to the Office of the United States Trustee.

#### 3. Retention of Property Manager

Prior to the Petition Date, the Debtor retained MagNola as property manager of the Debtor. MagNola is a full-service real estate development and financing advisory firm providing a variety of advisory and corporate structuring services, including with respect to mergers and acquisitions, capital raising, and restructuring advice, across a broad range of industries.

Under the terms of retention, MagNola is paid a monthly fee of $1,250.00 for the following services:

a. **Financial Assessment**: Gain a clear understanding of the companies' current financial situations.
b. **Operations Oversight**: Oversee ongoing operations at the properties.
c. **Representation**: Act as Owner's Representative with the Trustee or other individuals related to the Bankruptcy Filings.
d. **Vendor Communication**: Communicate with contractors and vendors to ensure work at the properties is done correctly and at market rates.
e. **Expense Approval**: Approve expenses and sign off on all payments related to the operation of the properties.
f. **Financial Review**: monthly financial statements.
g. **Lease Management**: Communicate with brokers to secure and approve leases.

h. **Compliance**: Ensure properties remain current with insurance, taxes, and code requirements.

MagNola is currently being paid by Equity Holders of the Debtor.

## 4. Retention of Professionals

On August 16, 2024, the Court approved the retention of Patrick S. Garrity and The Derbes Law Firm, LLC as counsel for the Debtor on an interim basis [ECF Doc. #15]. A Final Order approving the retention of counsel was entered. The Derbes Law Firm, LLC is billing the Debtor on an hourly basis.

The Debtor retained Latter & Blum Holding, LLC, dba NAI Latter & Blum November 1, 2024, [ECF Doc. #88] to serve as broker and leasing agent to the Debtor. Latter & Blum will be compensated by a commission on rental agreements.

The Debtor retained Patrick J. Gros, CPA, A Professional Accounting Corporation through an interim order to provide accounting services to the Debtor. Patrick Gros is billing the Debtor on an hourly basis and is holding a retainer in the amount of $3,000.00.

The Debtor has retained The Derbes Law Firm, LLC, as special counsel to pursue the Debtor's claims against N'Awlins Entertainment of Louisiana, Inc. and its guarantor. The Derbes Law Firm, LLC will be compensated on a contingency fee basis of 33%.

The Debtor anticipates retaining counsel to pursue collection of unpaid rents and damages against former tenants and other parties to be paid on a contingency fee basis. Counsel is also investigating potential action against the Keeper, his insurance, or their contractor, for improperly handling the roof/air conditioning leak.

## 5. Use of Cash Collateral

On September 20, 2024, the Debtor filed an *Emergency Motion for an Order (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Party, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [ECF Doc. #23] seeking authority to use the rental proceeds for operation of the Debtor's business. The use of cash collateral was approved on an interim basis by Order dated November 7, 2024 [ECF. Doc. #56]. Due to the departure of the Debtor's tenant, the motion to use cash collateral was withdrawn.

## 6. Bar Date

A deadline to file proofs of claims was set by order of this Court on October 15, 2024 [ECF. Doc. #48]. Pursuant to the Court's order, November 20, 2024, was established as the Bar Date for filing all proofs of claim against the Debtor's Estate, except for governmental units, for which the bar date was February 3, 2025.

### 7. Professional Fees

A fee application in the amount of $48,679.00 for Debtor's counsel was approved on March 6, 2025 [ECF. Doc. 176]. The former SubChapter V Trustee, Lucy Sikes, also had fees approved in the amount of $5,500.00. No other Professionals have filed an application for fees and reimbursement of expenses.

### 8. DIP Financing

On November 22, 2024, the Debtor filed a motion seeking debtor in possession financing from Argyle Holdings, LLC [ECF Doc. #104] for up to $200,000.00 to fund capital investment into the property and operational cash reserves for bank related or property operational requirements (such as build-out costs), complete the white boxing of the Property and other operating expenses. The Debtor withdrew that motion due to a contribution from Existing Equity Interests.

### 9. Marketing the Property

The Debtor engaged Latter & Blum as leasing agent prior to the filing of this case. The listing agreement with Latter & Blum is expired and will not be renewed by the Debtor. A report from Latter & Blum detailing the marketing plan for each building is attached as **Exhibit 3**. The marketing of the Property had a slower rollout than expected after the bankruptcy filing occurred due to BOA and its keeper changing all locks and refusing to issue keys to the Debtor timely. During this time and prior to filing, the Debtor lost potential tenants due to BOA's refusal to accept multiple pending leases or allow the Debtor to effectuate contracts which deals were lost. With the keeper and BOA in control, all groundskeeping, landscaping and general maintenance at the property ceased. When the Debtor regained control of the Property, trash and debris were strewn about from tenants who moved out due to mismanagement by BOA's keeper, neighboring properties, and general customer traffic debris. BOA's keeper cancelled regular maintenance such as window cleaning and bi-annual pressure washing as well as ALL grass cutting, landscaping, and trash receptacle services. Initial lease tours were challenging as potential tenants requested additional rent concessions or short term leases. A proactive renovation plan to refresh the interior, exterior and common areas of the Properties has been completed since January 2025, and all units are rentable to all spaces. Construction photos from the Property are attached as **Exhibit 4**.

Debtor's management recently discovered that Latter & Blum was either unresponsive or delayed in responding to prospective tenants. Latter & Blum sought tenants for five year leases with very strict underwriting guidelines. The listing agreement provided for immediate full payment of the broker's commission. Latter & Blum refused requests from the Debtor that Latter & Blum review tenant prospects on a case by case basis to allow underwriting and acceptance for applicants that may require shorter lease terms and quarterly billing of agents' commission fees. This compensation structure resulted in the prospective tenant pool being relegated to national or regional chains. With the strict underwriting guidelines required to meet this burden, Latter & Blum did not respond to or refused to consider local tenants, small businesses, or tenants with a new business. The tenants sought by Latter & Blum simply did not fit in the market for the Debtor's Property. Latter & Blum also didn't respond to Debtor's request to apply and update marketing photos nor adjust pricing to be

more competitive in market during initial lease up. The insufficient responses and safeguards of Latter & Blum forced the Debtor to retake operational control of marketing efforts, with a new lease recently acquired. Based on the availability of the Property, positive responses received by management, and the interest shown in the Property, the current lack of tenants is directly related to Latter & Blum's incompatible marketing plan. While the Debtor is interviewing potential brokers that are more focused on the local market and amenable to a quarterly compensation structure that provides much less risk to the Debtor, current management is handling the leasing process. The Debtor also took control of leasing the properties owned by Rise Management, LLC and Veterans Holdings, LLC. Since taking over the leasing at Rise Management, LLC and Veterans Holdings, LLC, three new leases have been entered into with three additional leases pending. The Debtor has successfully operated the Property since 2013, as evidenced by BOA's appraisal of $1,800,000.00 and BOA's extension of its loan in 2022. With the Debtor's proven record of operating the Property and the feedback from potential tenants, the Debtor believes that proper marketing by a new broker, combined with the refresh and curb appeal white box plan designed by the Debtor's manager, Cullan Maumus, will restore the financial stability to the Debtor.

The Debtor will be retaining a new leasing agent to market the Property which will need to follow the historic marketing plan which was successful at lease up and stabilization as reflected in prior years. Furthermore Latter & Blum insisting on its leasing commission being paid in full hamstrung the Debtor with STRICT underwriting guidelines. Had Latter & Blum adjusted leasing structure to quarterly earned commissions and release of commissions owed by Debtor if tenant was evicted, the Property would be filled. The Debtor WILL require new leasing agents to accept a more flexible leasing structure so guidelines for application acceptance could be more flexible with current market conditions. This structure has proven to be a success and positively impacted leasing efforts.

Due to each use and varying brand requirements, the Debtor will not perform full renovation of the suites to turnkey condition until a tenant is secured. Once secured, required conditions and materials will be outlined during negotiations for it to be provided upon execution of a binding lease agreement. Building out suites prior to securing tenants will result in unnecessary capital expenditure while narrowing prospective tenants based on intended use.

### a. Strategic Positioning of the Property

From a marketing perspective, the Property stands out in the market due to its prime location within a major retail corridor, offering convenient access to US-90, the New Orleans central business district, the Naval Air Station Joint Reserve Base, and signalized intersections along General DeGaulle. The Debtor has made significant engineering upgrades, enabling the relocation of demising walls to provide flexibility in accommodating a range of tenant needs. This adaptability allows for various layout configurations, making the property suitable for a wider array of tenant types. There is a limited availability of turnkey second-generation restaurant spaces within this submarket, and few retail office centers in the trade area can accommodate such a model, positioning this property as a unique and valuable asset.

With the site and operational plan, the Creditors are protected from additional exposure as the majority of any tenants incoming could take over the 2nd generation restaurant or retail

space with minimal build out design needed. Build out costs will be borne by future tenants and will be negotiated within base rent by abated partial concessions and/or other terms that were negotiated by the Debtor and tenant. This pricing structure will ensure the financial success and stabilization of the Property while enhancing the co-tenancy by ensuring the foot and vehicular traffic are balanced and tenants can draw from each other's clientele.

### b. Projected Lease-Up Timeline

The Debtor anticipates the following timeline to achieve market lease rates/terms for this submarket:

- 3 - 6 Months for 3301 General DeGaulle
- 4 - 11 Months for 3321 General DeGaulle, Suites A, B, C, and D.
- 4 - 11 Months for 3361 General DeGaulle, Suites B, C/D, 201, 202, 203, and 204B.

The Debtor will also be changing the leasing commission structure to allow more flexibility in approving tenants to occupy space for an early leasing time period.

Attached as **Exhibit 5** are photographs showing the Properties upon completion.

### c. Anticipated Revenue

The historical rental data and the current market rental rates are shown in **Exhibit 6**. Once fully rented, the Debtor projects monthly revenue of $14,559.00 and NNN fees of $6,424.00, which is sufficient to fund the Plan. Lease comparables are attached as **Exhibit 7**. The rental revenue projections are based on low market rates and are below the historical rental rates. The Debtor's expenses, variable expenses of operation, insurance, and other costs will be passed through to tenants and protect Creditors from market fluctuation pricing. The Debtor will not be required to maintain the interior of units.

In addition, the Debtor intends to pursue two cost saving measures, which would be passed on through NNN fees. The savings for all tenants as well as the Debtor will assist cash flow.

- Engage property tax firm to reduce property taxes. Fees would only be paid through a success fee of 25-32% of yearly property tax savings.
- Review additional elements into structure or building for future tenant build outs. This would add additional discounts to reduce insurance coverage costs and incorporate into lease price benefit for all tenants.

Additionally with lower current value and lower loan balance with BOA, the Debtor will seek to reduce insurance requirements on wind and fire to $1.25 million and remove any terrorism coverage required in the BOA Loan Documents. Capital has agreed to this reduction for next 5 years.

### 10. Leasing of the Property

A schedule of current leases and terms is attached as **Exhibit 8**.

### D. VALUATION OF THE DEBTOR'S ASSETS

The Debtor's primary asset is real property located at 3301, 3321, & 3361 General DeGaulle, New Orleans, Louisiana. The Debtor estimates the current value of the Property is $1,700,000.00. An appraisal of the Property prepared by Cook Moore in 2022, which is attached as **Exhibit 9**, valued the Property at 1,800,000.00. Due to a decrease in tenants, the Property value was decreased.

Upon lease up and stabilization, even using BOA appraiser's very conservative cap rate at 8.5%, the value of the Property would significantly increase from the current low value based only upon a short term vacancy period. Current market conditions show that if the Property was listed on the open market, it would likely trade at 7% cap rate or better for a substantially higher price. When fully leased, the Debtor estimates the Property using the same conservative cap rate as BOA's appraiser will be at least $1,900,000.00.

| | 12/31/2025 | 12/31/2026 | 12/31/2027 | 12/31/2028 | 12/31/2029 |
|---|---|---|---|---|---|
| | **Year 1** | **Year 2** | **Year 3** | **Year 4** | **Year 5** |
| NOI | 110,245 | 157,622 | 162,341 | 167,238 | 172,282 |
| Cap Rate (2022 Appraisal) | 8.5% | 8.5% | 8.5% | 8.5% | 8.5% |
| Market Value | 1,296,995 | 1,854,371 | 1,909,891 | 1,967,505 | 2,026,848 |

### E. FINANCIAL FORECAST OF THE DEBTOR

The financial forecast of the Debtor is based upon the funds generated from operation of the Debtor's business and assumes an occupancy rate of 100%. Cash distributions will come from current operations, Litigation Proceeds, and, if necessary, Equity infusions of capital. The Debtor's financial projections are based on rentals increasing during 2025, reaching a 100% occupancy rate by November 2025.

#### 1. Equity Infusion

Existing Equity Holders have contributed $25,000.00 to fund all remaining repairs and renovations to the Property. JBIT, a member of the Debtor, will guarantee $200,000.00 of obligations to BOA during the term of this Plan. The funds to guarantee payment will be a capital contribution from JBIT through Capital Advisors and will only be used as needed to fund plan obligations. A dedicated account has been established by Capital Advisors with a current balance in excess of $200,000.00. In the event the Equity Infusion from Sale Proceeds are not available due to a delay in the closing date, JBIT will guarantee payment of $148,000.00 through funds advanced to JBIT, with JBIT being reimbursed the $148,000.00 payment upon closing of the sale. A declaration of Janice Bruno detailing the extent of JBIT's guarantees, current statement from the dedicated account, and a letter from Capital Advisors verifying the credit line would be extended and the funds shown in the dedicated account are only to be used to fund JBIT's guaranty and only allowed to be used for plan approved obligations, are attached *en globo* as **Exhibit 11**. The Debtor will not be responsible for repayment of any funds provided by JBIT pursuant to this guaranty, nor will any property of the Debtor be used as collateral for the guaranty.

**2. Equity Infusion From Sale Proceeds**.

The funds for the equity infusion will be obtained from distributions generated through the sale of property owned by Granaio, LLC, a separate non-debtor entity of which JBIT is a member, to Mid Point Algiers, LLC. The purchase price is $14 million. After payment of existing mortgages and other fees, the remaining sales proceeds will be sufficient for JBIT to fund the equity infusion along with other operational future requirements where capital infusion maybe needed to execute on plan herein. On May 7, 2025, a Purchase and Sale Agreement was executed by both seller and purchaser. Attached as **Exhibit 10** is a description of the property to be sold. All All due diligence and inspections are completed. The executed Purchase and Sale Agreement does not contain any financing contingencies. Thomas Carlotto, counsel for JBIT, has prepared the finance agreements, purchase agreement, bill of sale, title affidavit, and other documents necessary to complete the sale. Title Depot has been selected as the closing agent and closing is scheduled for October 24, 2015. The preliminary HUD statement for the closing is attached as **Exhibit 13**. The distribution from the sale would be sufficient to fund the $148,000.00 payment. The cash infusion will prepay the first $148,000.00 of obligations to BOA under the plan (approximately eighteen (18) months). This equity infusion will only impact treatment of the Class 2 Claim. Projections detailing payments to classes are attached as **Exhibit 12.**

## IV. PLAN OF REORGANIZATION AND TREATMENT OF CLAIMS/INTERESTS

Rise Management, LLC as debtor and debtor-in-possession, proposes the following Chapter 11 Plan of Reorganization with respect to its Chapter 11 Case pursuant to section 1121(a) of title 11 of the United States Code (the "Bankruptcy Code").

Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Fed. R. Bankr. P. 3019, the Debtor respectfully reserves the right to alter, amend, modify, revoke or withdraw this Plan prior to consummation of this Plan.

This Plan is the product of extensive discussions and arm's-length negotiations and has been made subject to required disclosure and solicitation of votes under Section 1125. The documentation related to the Plan shall not be construed against the drafter.

NO SOLICITATION MATERIALS, OTHER THAN THE DISCLOSURE STATEMENT AND RELATED MATERIALS TRANSMITTED THEREWITH THAT ARE APPROVED BY THE BANKRUPTCY COURT, HAVE BEEN AUTHORIZED BY THE BANKRUPTCY COURT FOR USE IN SOLICITING ACCEPTANCE OR REJECTION OF THIS PLAN.

The Debtor has proposed the Plan and believes that the classification and treatment of Claims provided for in the Plan are consistent with the requirements of the Bankruptcy Code. Under the Bankruptcy Code, Holders of Allowed Claims against the Debtor that are impaired and that receive distributions under the Plan are entitled to vote on the Plan. A summary of the classification and treatment of Claims and Interests under the Plan is set forth above in this Disclosure Statement.

Any interest rates for the Creditors set forth in the Plan are based upon federal law, Louisiana law and the current market rate for commercial loans.

## A.  TREATMENT OF CLAIMS AND INTERESTS

The Plan contemplates payments to all Holders of Allowed Claims against the Debtor based upon the cash flow created through the business operations of the Debtor or, alternatively, Liquidation of the Debtor's assets. The Holders of Equity Interests will not receive any Distribution unless the following conditions have been met: (a) all Unclassified Claims except for Priority Claims have been paid in full; and, (b) the Debtor is current on all payments to the Holders of Priority Claims and the Class 2, 3, 4 and 5 Claims as required by this Plan.

## B.  CLASSIFICATION OF CLAIMS.

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Interests in the Debtors. A Claim or Interest is placed in a particular Class for the purposes of voting on this Plan and of receiving Distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been paid, released, withdrawn or otherwise settled prior to the Effective Date. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims of the kinds specified in sections 507(a)(2) and 507(a)(8), respectively, of the Bankruptcy Code have not been classified and their treatment is set forth in Article II

The Debtor hereby designates the following classes:

- Class 1 Tenant Deposit Claims. Class 1 shall consist of all Tenant Deposit Claims.

- Class 2 Secured Claim. Class 2 consists of the Allowed Secured Claim of BOA in the approximate amount of $1,389,433.83.

- Class 3 Secured Claim. Class 4 consists of the Allowed Secured Claim of Capital Advisors in the approximate amount of $250,000.00.

- Class 4 Secured Claim. Class 4 consists of the Allowed Secured Claim of City of New Orleans in the approximate amount of $33,187.23.

- Class 5 Unsecured Claims. Class 5 consists of the Allowed General Unsecured Claims in the approximate amount of $1,433,000.00.

- Class 6 Interests. Class 6 shall consist of all Equity Interests in the Debtor.

## C.  CLAIMS UNDER THE PLAN

Claims and Interests are treated as follows under this Plan:

| CLASS | TREATMENT |
|---|---|
| **Class 1 – Tenant Deposit Claims**<br><br>Unimpaired – Deemed to Accept | Each Holder of an Allowed Tenant Deposit Claim shall retain its legal, equitable, and contractual rights to which it may be entitled under state law. |
| **Class 2 – Bank of America, NA Secured Claim**<br><br>The total estimate of the Allowed Class 2 Claim is $1,389,433.83.<br><br>Impaired. Entitled to vote. | The Secured Claim of Bank of America, N.A. is fully secured and allowed in the approximate amount of $1,389,433.83. The Class 2 Claim shall be amortized over thirty (30) years at the contractual rate of SOFR plus <u>2.95</u>%, with the applicable SOFR rate on the Effective Date. The applicable interest rate will be subject to change according to the terms of the BOA Loan Documents. Payments will commence on the last day of the first month after the Distribution Date and will continue through the 36th month after the Distribution Date. Within thirty (30) days from the Distribution Date, the Janice Bruno Irrevocable Trust, holder of an Existing Equity Interest, will pay a lump sum payment of $148,000.00 to BOA as a prepayment of approximately the first fifteen months, with monthly payments of principal interest resuming in the 16th month after the Distribution Date. A true up will occur at the end of the fifteenth month when the Bank calculates the actual amounts due using the applicable variable interest rate. Any deficiency will be paid with the payment due on the 16th month; any surplus will be applied to the payment due for the 16th month. A balloon payment for the remaining balance of the Class 2 Claim shall be paid on the last day of the 37th month after the Distribution Date. Based on current information, the Debtor estimates that the balance due under the balloon payment will be $1,357,691.00. The balloon payment will be funded through BOA's collateral being refinanced with a third party lender, payoff by an equity holder, or a sale of the collateral. The Class 2 claim is secured by a mortgage on the Debtor's real property. BOA shall retain its lien on the Debtor's property until paid in full.<br><br>**Sale of Building.** If the Debtor sells one or two of the three buildings owned by the Debtor, the proceeds of the sale shall be allocated first to prepayment of obligations to BOA under the Plan until BOA is paid in full. Any funds remaining after all quarterly or monthly payments have been prepaid to BOA shall be applied to the outstanding balance of BOA until BOA is paid in full.<br><br>**Default**. If the Debtor defaults on its payment obligations to BOA pursuant to this Plan or does not remain current on |

| | |
|---|---|
| | property taxes, such default must be cured within sixty (60) days of written notice of default.  If the Debtor fails to cure the default within sixty (60) days of written notice, the Debtor will consent to reopening this case and conversion to Chapter 7.

**Other Defaults**.  BOA reserves the right to enforce all other default provisions under the BOA Loan Documents.   For avoidance of doubt, as set forth in this Plan, only defaults of: (1) payment obligations to BOA; (2) payment of property taxes; and, (3) maintaining insurance may trigger a conversion of this case to Chapter 7.

Estimated percentage recovery: 100% |
| **Class 3 – Capital Advisors**

The total estimate of the Class 3 Claim is $1,404,677.00. The remaining balance of $1,154,677.00 shall be paid in Class 5.

Impaired.  Entitled to Vote. | The Capital Secured Claim is Allowed in the amount of $250,000.00, which is the value of the Debtor's Collateral.   The remaining amount of Capital Claim is unsecured and will be treated in Class 4.  The Class 3 Claim shall be amortized over ten (10) years at the rate of 8.5%.  Commencing the last day of the 7th month after the Distribution Date, the Debtor will make monthly payments of principal and interest in the amount of $3,099.64, with payments continuing for the next one hundred thirteen (113) months until paid in full.  The Class 3 Claim is secured by a second mortgage on the Debtor's real property. Capital Advisors shall retain their Lien on the Debtor's property until paid in full.

Estimated percentage recovery: 100% |
| **Class 4 – Property Tax Claims**

The total estimate of the Class 4 Claim is $33,187.23.

Impaired.  Entitled to Vote. | The Secured Claim of City of New Orleans is allowed in the approximate amount of $33,187.23.   In accordance with Louisiana Constitution Article 7, Section 25(B), the Class 4 Claim shall be paid by the earlier of forty-five (45) days after the Effective Date or the redemption date, including a five percent (5%) penalty thereon, and interest at the rate of one percent per month until redemption.  The Class 4 claim is secured by a third ranking lien on the Debtor's real property.  City of New Orleans shall retain its lien on the Debtor's property until paid in full.

Estimated percentage recovery: 100% |
| **Class 5 – General Unsecured Claims**

The total estimate of the Class 5 Claims is $1,432,534.02. | Each Holder of an Allowed General Unsecured Claim shall receive quarterly cash payments equal to its Pro Rata share of $195,000.00, to be paid over a period of eighty-four (84) months. Payments shall commence on the first day of the fifteenth month after the Distribution Date. Class 5 will also receive fifty percent (50%) of the Litigation Funds, after payment of all Allowed Administrative Expense Claims, Priority Claims, and Priority |

| | |
|---|---|
| Impaired. Entitled to vote. | Tax Claims. Any distributions of Litigation Funds will not be applied towards the quarterly payment amounts.<br><br>Estimated percentage recovery: 13.61% |
| **Class 6 – Equity Interests**<br><br>Impaired. Entitled to vote | Although the Holders of Existing Equity Interests shall retain those interests after Confirmation, no distributions may be made to the Holders of such Equity Interests by virtue of same unless the following conditions have been met: (a) all Unclassified Claims except for Priority Claims have been paid in full; and, (b) the Debtor is current on all payments to the Holders of Priority Claims and the Class 2, 3, 4 and 5 Claims as required by this Plan.<br><br>Payments by Holders of Existing Equity Interests to fund repairs and renovations to the Property and provide infusions of capital will be deemed new value contributions by Equity.<br><br>Estimated percentage recovery: N/A |

### D. PROVISIONS FOR PAYMENT OF UNCLASSIFIED CLAIMS

The Plan provides for the payment of Claims against the Debtor, including the treatment of Unclassified Claims. The principal Administrative Expense Claims known to the Debtor are the fees and expenses of The Derbes Law Firm, LLC, the Debtor's attorneys, Lucy Sikes, former SubChapter V Trustee, Patrick J. Gros, accountant of the Debtor, and Bank of America. Additional fees and expenses will continue to be incurred through the Effective Date of the Plan. It is estimated that Administrative Expense Claims will be at least $100,000.00.

### 1. Administrative Expense Claims.

Except to the extent that any Entity entitled to payment of any Allowed Administrative Expense agrees to a less favorable treatment, each Holder of an Allowed Administrative Expense shall receive Cash equal to the unpaid portion of its Allowed Administrative Expense, on the latest of (a) the Distribution Date, (b) the date on which its Administrative Expense becomes an Allowed Administrative Expense, and (c) the date on which its Administrative Expense becomes payable under any agreement relating thereto, or as soon thereafter as is reasonably practicable. Notwithstanding the foregoing, any Allowed Administrative Expense based on a liability incurred by the Debtor in the ordinary course of business during the Bankruptcy Case shall be paid by the Debtor or the Reorganized Debtor as Administrative Expenses in the ordinary course of the Debtor's businesses, in accordance with the terms and conditions of any agreement relating to such other Administrative Expenses or upon such other terms as may be agreed upon between the Holder of such Administrative Expense and the Debtor, without application by or on behalf of any such parties to the Bankruptcy Court, and without notice and a hearing.

Applications for payment of Administrative Expense Claims (including requests for compensation under Section 503(b)(3), (4), and (9)) must be filed with the Bankruptcy Court and served on the Reorganized Debtor no later than thirty (30) days after the Effective Date. **The**

failure to file and serve properly upon Rise Management, the Reorganized Debtor and other parties-in-interest, in accordance with the Bankruptcy Code and the Bankruptcy Rules, such a motion or application for allowance and payment of an Administrative Expense Claim or a Professional Administrative Expense Claim by the Administrative Expense Claim Bar Date shall result in such Administrative Expense Claim being forever barred and discharged. For the avoidance of doubt, an Administrative Expense Claim asserted through a proof of Claim filed in the Bankruptcy Cases is invalid unless a timely motion for allowance and payment of an Administrative Expense Claim is filed. Notwithstanding the foregoing, the following parties shall not be required to file applications for payment: (i) Administrative Expenses incurred in the ordinary course of business; and (ii) Claims for United States Trustee fees. All other Holders of alleged Administrative Claims must satisfy their burden regarding allowance and payment of their Administrative Expense Claim and must file timely applications seeking approval thereof.

### A. Payment of BOA Administrative Claim

BOA is the holder of an allowed Administrative Claim in the amount of $20,200.00. The BOA Administrative Claim will be paid within ninety (90) days of the Effective Date.

### 2. United States Trustee Fees.

With respect to amounts due to the Office of the United States Trustee, the Reorganized Debtor shall pay the appropriate sum required by 28 U.S.C. § 1930(a)(6) within thirty (30) days of the Effective Date. The Reorganized Debtor shall timely pay the to the United States Trustee any and all post-confirmation quarterly fees as required by 28 U.S.C. § 1930(a)(6) until such time as these Bankruptcy Cases are converted, dismissed or closed by the Court. The Reorganized Debtor shall be entitled to an order administratively closing this Bankruptcy Case on or after the Effective Date pending the filing of a motion seeking a Final Decree and order closing this Bankruptcy Case. Additionally, the Reorganized Debtor shall submit to the United States Trustee post-confirmation quarterly operating reports in the format prescribed by the United States Trustee until such time as these Bankruptcy Cases are converted, dismissed, or closed by the Court.

### 3. Priority Tax Claims.

Each Holder of an Allowed Priority Tax Claim against the Debtor shall be paid in full in monthly installments over, and within, five years from the Petition Date pursuant to 11 U.S.C. § 1129(a)(9)(C) or from any remaining proceeds of the liquidation of the Debtor's assets pursuant to this Plan, after full payment of all Class 2, Class 3, Class 4, and Administrative Claims. The Debtor shall commence making monthly cash installments on the allowed Priority Tax Claims beginning on the Distribution Date. Such monthly payments shall continue with each consecutive month thereafter until the Allowed Priority Tax Claims have been paid in full by such installments. Statutory interest shall be paid upon Allowed Priority Tax Claims pursuant to 11 U.S.C. § 511. All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as such obligations become due. Any Priority Tax Claim secured by a lien shall retain such lien to secure its claim until paid in full. The estimate of Allowed Priority Tax Claims is $47,673.48.

### 4. Other Priority Claims.

The Debtor contends that there are no Allowed Other Priority Claims. To the extent there are any Other Priority Claims are Allowed Claims, each Holder of such Claim will receive the treatment required by Section 1129(a)(9)(A) or (B) of the Bankruptcy Code, as appropriate.

### 5. Ordinary Course Liabilities.

Holders of Administrative Expense Claims based on unpaid and undisputed amounts due by the Debtor in Possession for goods and services provided to it after the Petition Date and before the Effective Date arising in the ordinary course of the Debtor's business shall not be required to file any request for payment of such Claims, but each shall be deemed to be an Allowed Administrative Expense Claim in the undisputed amount recognized by the Debtor in Possession. Such deemed Allowed Administrative Expense Claims shall be paid in the ordinary course of business by the Debtor or from the proceeds of the sale of the Property without any further action by the Holders of such Claims.

### E. EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 1. Assumption of Contracts and Leases.

Except as otherwise provided herein or pursuant to the Confirmation Order, as of the Effective Date, all executory contracts and unexpired leases between the Debtors and any Person, including, but not limited to a leases and rental agreements with tenants of the Debtor, shall be assumed pursuant to section 365(a) of the Bankruptcy Code except for any executory contract or unexpired lease that has been assigned or rejected or renegotiated and either assumed or rejected on renegotiated terms, pursuant to an order of the Bankruptcy Court entered prior to the Effective Date. Entry of the Confirmation Order shall constitute approval, pursuant to section 365(a) of the Bankruptcy Code, of the assumption of executory contracts and unexpired leases provided for herein.

### 2. Cure of Defaults.

On the Effective Date, the Reorganized Debtor (a) shall cure or provide adequate assurance that it shall cure any and all undisputed defaults under any Assumed Contract, and (b) compensate or provide adequate assurance that it shall promptly compensate the other parties to such executory contract or unexpired lease for the agreed amount of any actual pecuniary loss to such party resulting from such undisputed default in accordance with section 365(b)(1) of the Bankruptcy Code. In the event that the Reorganized Debtor disputes the existence of a default, or the nature, extent or amount of any required cure, adequate assurance or compensation, the obligations of the Reorganized Debtor under section 365(b) of the Bankruptcy Code shall be determined at the Confirmation Hearing or at any other hearing ordered by the Bankruptcy Court, and any such obligations shall be performed by the Reorganized Debtor within thirty days after the Effective Date unless otherwise provided in the Confirmation Order or by other order of the Bankruptcy Court.

### 3. Rejection Claims.

If the rejection of an executory contract or unexpired lease by the Debtor (pursuant to this Plan or otherwise) results in a Claim, then such Claim shall be forever barred and shall not be enforceable against the Debtor and the Reorganized Debtor unless a Proof of Claim is filed and served upon counsel for the Debtor no later than thirty (30) days after the earlier of (i) entry of the Confirmation Order, or (ii) entry of an order approving such rejection. Unless otherwise ordered by the Bankruptcy Court, all Claims arising from the rejection of executory contracts and unexpired leases shall be treated, to the extent they are Allowed Claims, as Allowed Class 5 Claims.

## V. MEANS OF IMPLEMENTATION OF THE PLAN

### 1. Summary of Reorganization of the Debtor.

On and after the Effective Date, all Assets of the Debtor and its estate shall vest in the Reorganized Debtor free and clear of all Liens, encumbrances, and claims except for the Liens securing the Class 2, 3 and 4 Claims. On and after the Effective Date, the Reorganized Debtor may operate its business, may use, acquire and dispose of property, may retain, compensate and pay any professionals or advisors, and compromise or settle any causes of action, claims or interests without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan and the Confirmation Order. All payments due on or after the Effective Date shall be made from the Debtor's cash on hand and from the future revenues derived from the Reorganized Debtor's operation of the retail center owned by the Debtor.

### 2. Effective Date

The "Effective Date" of the Plan shall be the date specified by the Debtor in a notice filed with the Bankruptcy Court as the date on which the Plan shall take effect but shall occur not later than ninety (90) days after entry of the Confirmation Order. For the Plan to become Effective, the following conditions must be met:

      a. the Bankruptcy Court shall have entered the Confirmation Order;

      b. the Confirmation Order shall not be reversed, vacated, stayed, amended, supplemented, or otherwise modified, and shall be in full force and effect.

      c. all authorizations, consents, regulatory approvals, rulings, or documents that are necessary or appropriate to implement and effectuate the Plan shall have been received; and,

      d. all actions, documents, certificates, and agreements necessary or appropriate to implement the Plan, including Exit Financing, shall have been affected or executed and delivered, as the case may be, to and/or by the required parties and, to the extent required, filed with the applicable governmental units in accordance with

applicable laws, and all such documents, certificates and agreements shall be acceptable to all parties to the documents;

**3. Effect of Failure of Conditions**.

In the event that the conditions for the Plan to become Effective have not been satisfied on or before 90 days after the Confirmation Date, then without an order of the Bankruptcy Court: (a) this Plan shall be null and void in all respects; (b) any settlement of Claims or Interests provided for hereby shall be null and void without further order of the Bankruptcy Court; and (c) the time within which the Debtor may assume and assign or reject all executory contracts and unexpired leases shall be extended for a period of sixty (60) days after such date.

**4. Equity Infusion Guarantee**.

JBIT, a member of the Debtor, will guarantee $200,000.00 of obligations to BOA during the term of this Plan. The funds to guarantee payment will be a capital contribution from JBIT through Capital Advisors. Capital Advisors, LLC is a Nevis limited liability company that provides private financial and lending services globally. It is located in Charlestown, Nevis, West Indies and is not a member, insider, or related party to the Debtor or its members. The Debtor and other entities owned by some members of the Debtor are customers of Capital Advisors. Neither the Debtor nor its members have any ownership, control, or interest in Capital Advisors. A dedicated account has been established by Capital Advisors with a current balance in excess of $200,000.00. The Debtor will not be responsible for repayment of any funds provided by JBIT pursuant to this guaranty, nor will any property of the Debtor be used as collateral for the guaranty.

**5. Equity Infusion from Sale Proceeds**.

Besides the equity infusion described above, an additional equity infusion of $148,000.00 will be made by JBIT. The funds for the equity infusion will be obtained from profits generated through the sale of property owned by a separate non-debtor entity. In the event the Equity Infusion from Sale Proceeds are not available due to a delay in the closing date, JBIT will guarantee payment of $148,000.00 through funds advanced to JBIT, with JBIT being reimbursed the $148,000.00 payment upon closing of the sale. These funds have already been advanced to JBIT and are in an account controlled by JBIT at Chase Bank. This equity infusion will only impact treatment of the Class 2 Claim.

**6. Property Insurance.**

On or before October 27, 2025, the expiration date of the current lender placed insurance, the Debtor will obtain property insurance in accordance with the terms set forth in the BOA Loan Documents. If the Debtor defaults on its requirement to maintain property insurance, such default must be cured within forty-five (45) days of written notice of default. If the Debtor fails to cure the default within forty-five (45) days of written notice, the Debtor will consent to reopening this case and conversion to Chapter 7. The Debtor is not required to maintain flood insurance.

If the Debtor obtains property insurance coverage prior to the expiration of the current lender placed insurance, any premium returned to BOA shall be credited against BOA's administrative claim.  Upon confirmation of this Plan, BOA agrees to release any claims related to the proceeds from any claims arising during the period in which lender placed insurance was in effect and allow the funds not designated for payment to unsecured creditors to be placed into escrow for repair or improvement of the properties.  BOA also consents to the Debtor hiring counsel on a contingency fee basis to review and pursue any and all claims against lender placed insurance or other parties (excluding BOA).  The Debtor agrees to release BOA from all claims arising during the period in which BOA was the court-appointed Keeper of its collateral.

### 7.  Issuance of Non-Voting Securities

As of the Effective Date, the operating agreement of the Reorganized Debtor shall be amended to prohibit the issuance of non-voting equity securities to the extent required by section 1123(a) of the Bankruptcy Code.

### 8.  Post-Effective Date Management of the Reorganized Debtor.

Except as expressly provided in this Plan, the operation, management and control of the Reorganized Debtor shall be the sole responsibility of its Manager. After the Effective Date, Cullan Maumus will remain the manager of the Debtor and will be compensated monthly in the amount of $1,250.00.  Except as otherwise provided herein, this Plan will be administered and implemented by the Reorganized Debtor, which shall be vested with full legal power, capacity and authority, and shall be directed to administer and implement this Plan.

### 9.  Authorization to Implement this Plan.

The entry of the Confirmation Order shall constitute authorization for the Debtor and the Reorganized Debtor to take or cause to be taken all action necessary or appropriate to implement all provisions of, and to consummate this Plan and the Plan Documents prior to, on and after the Effective Date and all such actions taken or caused to be taken for which Bankruptcy Court authorization is required shall be deemed to have been authorized by the Bankruptcy Court without further act or action under any applicable law, order, rule or regulation, except as otherwise expressly set forth in this Plan.

### 10.  Effectuating Documents and Further Transactions.

The Debtor and the Reorganized Debtor are authorized and directed to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan.

### F.  CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtor and certain Holders of Claims and Interests. The

following summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the tax consequences described below.

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties. No assurance can be given that legislative or administrative changes or court decisions may not be forthcoming which would require significant modification of the statements expressed in this section. Certain tax aspects of the Plan are uncertain due to the lack of applicable regulations and other tax precedent. The Debtor has not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt.

TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND ANY INTERESTS ARE HEREBY NOTIFIED THAT (a) ANY DISCUSSION OF TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED UNDER THE TAX CODE, AND (b) THIS DISCUSSION WAS WRITTEN IN CONNECTION WITH THE PROMOTION OF THE PLAN.

THE ABOVE DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES. ACCORDINGLY, ALL HOLDERS SHOULD CONSULT THEIR TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

The Debtor is a conduit entity and, as such, pays no taxes. The plan treatment of the Debtor's assets generates a potential tax event for the equity holders of the Debtor. The tax event can be a gain or loss depending on the equity owner's basis in the Membership and the gain or loss can either be a capital gain or ordinary income depending on the individual's treatment of the investment in the Debtor.

## G. METHOD OF DISTRIBUTIONS UNDER THE PLAN.

### 1. Distributions for Claims Allowed as of the Effective Date.

Other than as set forth herein, all Distributions under this Plan to be made on the Effective Date to Holders of Claims that are Allowed as of the Effective Date shall be deemed made on the Effective Date if made on the Effective Date or as promptly thereafter as practicable, but in any event no later than 10 days after the Effective Date.

### 2. Distributions for Claims Allowed after the Effective Date.

Following the Effective Date, the Reorganized Debtor shall make all distributions that become deliverable to Holders of Allowed Claims.

### 3. Distributions for Claims and Equity Interests Allowed as of the Effective Date.

Except as otherwise provided herein or as ordered by the Bankruptcy Court, each Holder of an Allowed Claim shall receive the full amount of the Plan Distributions that the Plan provides for Allowed Claims in the applicable Class. All Cash Plan Distributions shall be made from available Cash of the Reorganized Debtor. Any Plan Distribution hereunder of property other than Cash shall be made by the Reorganized Debtor.

### 4. Distributions on Account of Allowed Claims.

All Allowed Claims in a particular Class held by a Creditor shall be aggregated and treated as a single Claim. Any Creditor holding multiple Allowed Claims shall provide the Debtor with a single address to which any distribution shall be sent. In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date.

### 5. Delivery of Distributions.

All Distributions to be made under this Plan shall be made to Holders of Allowed Claims (a) if any such Holder has filed a Proof of Claim, at the address of such Holder as set forth in the Proof of Claim, or at the addresses set forth in any written certification of address change delivered to the Disbursing Agent after the date of filing of such Proof of Claim, or (b) if any such Holder has not filed a Proof of Claim, at the last known address of such Holder as set forth in the Debtor's Schedules or Debtor's books and records.

### 6. Timing of Distributions.

Any payment or other Distribution required to be made under this Plan on a day other than a Business Day shall be due on the next succeeding Business Day. All payments or Distributions due on the Effective Date shall be made thereon or as soon as practicable thereafter but in no event later than ten calendar days after the Effective Date. Any payment of Cash made pursuant to this Plan shall be deemed made when such payment by check or wire transfer is transmitted.

### 7. Minimum Cash Distributions.

No Cash payment of less than ten dollars ($10.00) shall be made to any Holder of a Claim unless a request therefor is made in writing to the Reorganized Debtor.

### 8. Unclaimed/Undeliverable Distributions.

If any Cash or other Distribution pursuant to this Plan to any Holder of an Allowed Claim is returned as undeliverable, no further Distributions to such Holder shall be made until such time as the Reorganized Debtor is notified by written certification of such Holder's then-current address, at which time Distributions to such Holder shall be made without interest.

### 9. Failure to Claim Undeliverable Distributions.

Any Holder of an Allowed Claim that does not assert a claim pursuant to this Plan for an undeliverable Distribution within one year after the Distribution was initially attempted shall have its claim for such undeliverable Distribution discharged and such Distributions shall be deemed to be unclaimed property under section 347(b) of the Bankruptcy Code. After such date, all Cash or other Distribution shall be forfeited and transferred to or retained by the Reorganized Debtor free from any restrictions thereon, and the claim of any Holder to such Cash or other Distribution pursuant to this Plan shall be discharged and forever barred. Nothing contained in this Plan shall require the Reorganized Debtor to attempt to locate any Holder of an Allowed Claim.

### 10. Withholding and Reporting Requirements.

In connection with this Plan, the Debtor and the Reorganized Debtor, as applicable, shall comply with all withholding and reporting requirements imposed by federal, state, local, and/or foreign taxing authorities and all Distributions hereunder shall be subject to such withholding and reporting requirements. Notwithstanding the above, each Holder of an Allowed Claim that is to receive a Distribution shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any government unit, including income, withholding and other tax obligations, on account of such Distribution.

### 11. Setoff Rights.

The Reorganized Debtor may, but shall not be required to, setoff against or recoup from the Holder of any Allowed Claim on which payments or other Distributions are to be made hereunder, claims of any nature that the Debtor or the Reorganized Debtor may have against the Holder of such Allowed Claim. However, neither the failure to do so, nor the allowance of any Claim under this Plan, shall constitute a waiver or release of any such claim, right of setoff or right of recoupment against the Holder of such Allowed Claim.

### 12. Disallowed Claims.

In the event the Reorganized Debtor has a Cause of Action under Chapter 5 of the Bankruptcy Code against the Holder of a Claim, then such Claim shall be deemed disallowed pursuant to Section 502(d) of the Bankruptcy Code. If an objection to any such Claim is filed before Confirmation the Holders of such Claims may not vote to accept or reject this Plan until the Cause of Action against such Claimant has been settled or adjudicated by the Bankruptcy Court and any amounts due the Debtor have been received, unless such Holders have obtained an order of the Bankruptcy Court estimating such Claims for voting purposes.

**13. Estimated Claims**.

In the event any Claim is estimated for any purposes other than for voting, then in no event will such Claim be Allowed in an amount greater than the estimated amount.

**14. Modification of Payment Terms**.

With the written consent of the Holder of any Allowed Claim, to the extent provided in Section 1123(a)(4) of the Bankruptcy Code, the Reorganized Debtor may modify the treatment of any Allowed Claim at any time after the Effective Date.

**15. Security Deposits**.

To the extent the Debtor has posted security deposits (with landlords, utilities or otherwise) which are less than the indebtedness secured thereby, those amounts may be set off against Allowed Secured Claims upon the written consent of the Reorganized Debtor or upon entry of a Final Order authorizing such offset.

**H. ADMINISTERING CLAIMS.**

The Debtor and the Reorganized Debtor have the responsibility and authority for administering, disputing, objecting to, compromising and settling or otherwise resolving and finalizing Distributions (if any) with respect to all Claims. In addition, the Reorganized Debtor may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtor has previously objected to such Claim.

**1. Claims Objection Deadline.**

The Reorganized Debtor shall have until the date that is 90 days after the Effective Date to bring any objections to Claims; *provided, however,* that such deadline may be extended by the Bankruptcy Court upon ex parte motion of the Reorganized Debtor.

**2. Compromise and Settlements.**

From and after the Effective Date, and without any further approval by the Bankruptcy Court, the Reorganized Debtor may compromise and settle any Claims and Causes of Action against the Debtor or its Estate.

**3. Disallowance of Improperly Filed Claims.**

Any Administrative Expense Claim or other Claim for which the filing of a motion for allowance is required shall be disallowed if such filing is not timely and properly made and set for hearing contemporaneously therewith, subject to the right of the Claimant to seek permission

under applicable law to file a late Claim.

### 4. No Distributions Pending Allowance.

If a Claim or any portion of a Claim is disputed, no payment or Distribution shall be made on account of the disputed portion of such Claim (or the entire Claim, if the entire Claim is disputed), unless such Disputed Claim or portion thereof becomes an Allowed Claim.

### 5. Procedures Regarding Claims.

Prior to the Effective Date, the Debtor, and, after the Effective Date, the Reorganized Debtor, shall have authority to file, settle, compromise, withdraw or litigate to judgment any objections to Claims. Except insofar as a Claim is Allowed under this Plan, the Reorganized Debtor shall be entitled to and shall have sole discretion to object to any Claim asserted against the Debtor, and the Reorganized Debtor reserves the right to file any objection to any Claim on or before ninety (90) days after the Effective Date, and such time period can be extended for cause upon request and approval by the Bankruptcy Court. For the avoidance of doubt, the Debtor and the Reorganized Debtor after the Effective Date, specifically reserve and retain discretion to object to the validity, nature, and amount of any Claim, except those Claims deemed Allowed under this Plan.

### 6. Estimation.

The Debtor or Reorganized Debtor, as applicable, may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Section 502(c), regardless of whether the Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on any objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal related to any such objection. In the event the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtor or the Reorganized Debtor, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. Each of the aforementioned objection, estimation and resolution procedures are cumulative and are not exclusive of one another.

### 7. No Payment on Disputed Claims.

Notwithstanding any other provision hereof, if any portion of a Claim is a Disputed Claim, no payment or Distribution provided under the Plan shall be made on account of such Disputed Claim unless and until such Disputed Claim becomes an Allowed Claim. To the extent that a Disputed Claim ultimately becomes an Allowed Claim, Distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. The Disbursing Agent shall provide to the Holder of such Claim the Distribution (if any) to which such Holder is

entitled under the Plan on a date determined by the Reorganized Debtor, in its sole discretion, after such a Claim becomes an Allowed Claim and shall be deemed to have been made on the Effective Date, without any interest to be paid on account of such Claim.

## I. TIME BAR TO CASH PAYMENTS.

Checks issued by the Reorganized Debtor in accordance with this Plan in respect of Allowed Claims shall be null and void if not negotiated within sixty (60) days after the date of issuance thereof. Requests for reissuance of any check shall be made to the Reorganized Debtor by the Holder of the Allowed Claim to whom such check was originally issued. Any such request in respect of such a voided check shall be made on or before thirty (30) days after the expiration of the sixty (60) day period following the date of issuance of such check. Thereafter, the amount represented by such voided check shall irrevocably revert to the Reorganized Debtor and any Claim in respect of such voided check shall be discharged and forever barred from assertion against the Reorganized Debtor.

## J. ALLOCATION OF PLAN DISTRIBUTION BETWEEN PRINCIPAL AND INTEREST.

All Plan Distributions to the extent not otherwise allocated in respect of any Allowed Claim made by the Reorganized Debtor shall be allocated first to the principal amount of such Allowed Claim, as determined for federal income tax purposes, and thereafter, to the remaining portion of such Claim comprising interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).

## K. EFFECT OF CONFIRMATION OF THE PLAN

### 1. Discharge

Except as otherwise expressly provided in this Plan or the Confirmation Order, Confirmation of this Plan shall as of the Effective Date: (i) discharge the Debtor, the Reorganized Debtor and any of their Assets from all Claims demands, liabilities, other Debts and Interests that arose on or before the Effective Date, including, without limitation, all Debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not (A) a Proof of Claim based on such Debt is filed or deemed filed pursuant to section 501 of the Bankruptcy Code, (B) a Claim based on such Debt is Allowed pursuant to section 502 of the Bankruptcy Code, or (C) the Holder of a Claim based on such Debt has accepted this Plan; and (ii) preclude all Persons from asserting against the Debtor, the Reorganized Debtor or any of their Assets any other or further Claims or Interests based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, all pursuant to sections 524 and 1141 of the Bankruptcy Code. The discharge provided in this provision shall void any judgment obtained against any of the Debtors at any time, to the extent that such judgment relates to a discharged Claim or cancelled Interest.

### 2. Injunction

**Except as otherwise provided in the Plan or the Confirmation Order, all entities**

that have held, currently hold or may hold Claims or other Debts or liabilities against the Debtor that are discharged pursuant to the terms of the Plan are permanently enjoined, on and after the Effective Date, from taking any of the following actions against the Debtor, the Reorganized Debtor, or the property of either on account of any such Claims, debts, liabilities or Interests or rights: (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim Debt, liability, Interest or right other than to enforce any right to a Distribution pursuant to this Plan; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award decree or order against the Debtor, the Reorganized Debtor or any of their Assets on account of any such Claim Debt, liability, Interest or right; (iii) creating, perfecting or enforcing any Lien or encumbrance against the Debtor, the Reorganized Debtor or any of their Assets on account of any such Claim Debt liability, Interest or right; (iv) asserting any right of setoff subrogation or recoupment of any kind against any Debt, liability or obligation due to the Debtor, the Reorganized Debtor or any of their Assets on account of any such Claim Debt, liability, Interest or right; and (v) commencing or continuing any action in any manner, in any place that does not comply with or is inconsistent with the provisions of this Plan or the Confirmation Order. Such injunction shall extend to any successor of the Debtor, the Reorganized Debtor and any of their Assets.

### 3. Exculpation

Except as otherwise specifically provided in the Plan, the Debtor shall not have or incur, and is hereby released and exculpated from, any Cause of Action for any Claim or Claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the formulation, preparation, dissemination, negotiation, filing, or termination of the Disclosure Statement, the Plan, or any restructuring transaction under or to be implemented by and under the Plan, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by the Debtor on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Rise Management Chapter 11 Case, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for Claims related to any act or omission that is determined in a Final Order of the Bankruptcy Court, which shall have exclusive jurisdiction over any such Claim, to the fullest extent provided by law, to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan, to the fullest extent provided under applicable law, but no further. The Debtor has, and upon the Effective Date and completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such Distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or

Distributions made pursuant to the Plan.

### L. CLAIMS AGAINST OTHERS

The Debtor has claims against the following former tenants for lease defaults and damages. Counsel for the Debtor is pursuing litigation against N'Awlins Entertainment of Louisiana, Inc., et al. Prior to being forced to file this case, the Debtor was entering settlement discussions with a well-funded defendant.

| Party | Nature of claim | Amount of Claim |
|---|---|---|
| N'Awlins Entertainment of Louisiana, Inc., et al | Unpaid rent, damages, and legal fees | $900,000.00 |
| Cocktail & Sons | Unpaid rent, damages, and legal fees | $85,000.00 |
| Peppermint Room | Unpaid rent, damages, and legal fees | $50,000.00 |
| Crescent Coast Tattoos | Unpaid rent, damages, and legal fees | $45,000.00 |
| Liberty Tax | Unpaid rent, damages, and legal fees | $20,000.00 |
| SMP Micro Pigment | Damages | $75,000.00 |
| Colistics Pharmacy | Unpaid rent, damages, and legal fees | $50,000.00 |

Except as provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code and to the fullest extent possible under applicable law, the Reorganized Debtor shall retain and may enforce, and shall have the sole right to enforce, any Claims, demands, rights and Causes of Action that the Debtor or its Estate may hold against any Entity. After confirmation, the Reorganized Debtor or its successor will pursue such retained claims, demands, rights or Causes of Action, as appropriate. Further, the Reorganized Debtor, as the case may be, retains its rights to file and pursue, and shall have the sole right to file and pursue any adversary proceedings against any account debtor related to debit balances or deposits owed to any Debtor.

For purposes of the plan projections, the Debtor has estimated a recovery of $271,850.00 from claims against third parties. This amount is twenty-three percent of the total claims against third parties, after payment of projected fees and costs. The recovery is shown in January 2026 of Exhibits 10 and 12.

### M. CLAIMS AGAINST INSIDERS AND RELATED PARTIES

According to the Debtor's financial records, the following claims by or against related entities of the Debtor existed on the Petition Date:

| Party | Due To | Due From | Net Amount |
|---|---|---|---|
| 635 N. Scott St., LLC | $0.00 | $4,800.00 | $4,800.00 |
| Bruno, Inc. | $63,310.76 | $7,155.00 | ($56,155.76) |

| Downtown Development Group, LLC | $0.00 | $13,875.00 | $13,875.00 |
| Joshua L. Bruno | $0.00 | $11,920.11 | $11,920.11 |
| Metro Wide Apts. II, LLC | $0.00 | $3,461.00 | $3,461.00 |
| West Centro, LLC | $0.00 | $11,050.00 | $11,050.00 |
| Veterans Holding, LLC | $26,128.00 | $1,000.00 | ($25,128.00) |
| Taylor Park, LLC | $6,550.00 | $400.00 | ($6,150.00) |
| Mercury Capital | $20,181.00 | $11,000.00 | ($9,181.00) |

An analysis of the due to/due from claims shows that four entities, Bruno, Inc., Veterans Holdings, LLC, Taylor Park, LLC, and Mercury Capital are creditors of the Debtor.  The remaining entities, 635 N. Scott, LLC, Downtown Development Group, LLC, Joshua L Bruno, Metro Wide Apts, II, LLC, and West Centro, LLC, each owe funds to the Debtor. Of the entities with amounts owed to the Debtor, the claims against West Centro, LLC and Joshua L. Bruno are not collectible.  West Centro, LLC is currently a debtor in a Chapter 11 case pending before this Court, and Joshua L. Bruno has numerous existing judgments against him that would make collection unlikely.  With the claims against 635 N. Scott, LLC and Metro Wide Apts. II, LLC are each less than $5,000.00, it is not in the best interests of the estate to pursue collection of such de minimis amounts.  The amounts due from Downtown Development Group, LLC are not sufficient to justify retaining counsel on an hourly basis to pursue collection of this debt.  It is unlikely that the Debtor could retain an attorney to pursue collection of this debt on a contingency fee basis.  Counsel for the Debtor has spoken to attorneys who routinely handle collection matters and they were not interested in pursuing these claims on a contingency fee basis.  Based on the small amounts owed to the Debtor and the professional fees that would be incurred pursuing these claims, it is not in the best interests of the estate to pursue any claims against related parties.

The Litigation Funds recovered from claims against others or claims against insiders and related parties will be paid in a waterfall method to Allowed Administrative Expense Claims, Priority Claims, Priority Tax Claims, and then to Holders of Allowed Class 5 Claims.  Upon confirmation of the Plan, Insider claims will be reduced to the net amount of the due to/due from claims.

## VI. LITIGATION

The Debtor was a party to two lawsuits prior to the filing of this case, which have been stayed by the Debtor's bankruptcy filing.

*Bank of America, N.A. v. Rise Management, LLC,* was filed on February 20, 2024, in the Civil District Court for the Parish of Orleans, Case #2024-01461.  BOA filed a petition to foreclose on its Collateral.  The case was stayed by the filing of the Chapter 11.

*Rise Management, LLC v. N'Awlins Entertainment of Louisiana, Inc. and Guy W. Olano, III,* was filed on March 11, 2020, in the Civil District Court for the Parish of Orleans, Case #20-2445.  The Debtor is seeking damages due to a breach of lease.  Upon information and belief, defendant Guy W. Olano, III, is solvent and this claim is collectible.

## VII. LIQUIDATION ANALYSIS UNDER CHAPTER 7

Under the Bankruptcy Code, for a plan to be confirmed, each Creditor must receive or retain under the Plan a recovery that has a value at least equal to the value of the Distribution that such Creditor would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code.

The following Chapter 7 liquidation analysis ("Analysis") presents the estimated net value of the Assets of the Debtor, assuming that the Debtor's assets are liquidated under the provisions of Chapter 7 of the United States Bankruptcy Code, and that the net proceeds from the liquidation of the Debtor's assets are applied among the Creditors of the Debtor's Estate.  The Analysis indicates the estimated values that might be obtained by classes of Claims if the Debtor's assets were liquidated pursuant to a Chapter 7 liquidation, as an alternative to the Plan.

In this case, the only assets of the Debtor are the real estate located in New Orleans, Louisiana and claims against former tenants.  The property was appraised by Bank of America at a value of $1,800,000.00.  The value of the claims against former tenants is unknown.  Due to the mortgages exceeding the value of the property, it is likely that the Chapter 7 trustee would abandon the Estate's interest in the property, allowing BOA to foreclose on its Collateral.

Based on this Analysis, unsecured Creditors would only receive a distribution from Litigation Proceeds or claims against former tenants.  Accordingly, liquidation under Chapter 7 would not produce greater value for Distribution to Creditors than that recoverable under the Plan.

Underlying the Analysis are several estimates and assumptions that are inherently subject to significant uncertainties and contingencies beyond the control of the Debtor or a Chapter 7 trustee.  Therefore, there can be no assurance that the assumptions and estimates employed in determining the liquidation value of the Debtor's assets will result in an accurate estimate of the proceeds that would be realized should the Debtor undergo actual liquidation. The actual amounts of claims against the Estate could vary significantly from the Debtor's estimates depending on the claims asserted during the pendency of the bankruptcy proceedings and the outcomes of the Debtor's Claims objections. The Analysis does not include the effect of any federal or state income tax liabilities that may arise as a result of the conversion of the case, if any. The Analysis also does not include liabilities that may arise as a result of lease or contract rejections, litigation, ad valorem tax assessments, or other potential Claims unless expressly disclosed herein.  A chart reflecting the hypothetical Distribution in a Chapter 7 case based on a liquidation of the Debtor' assets is set forth below:

HYPOTHETICAL DISTRIBUTION UNDER CHAPTER 7

| | Claims | Estimated Distribution | Balance |
|---|---|---|---|
| ASSETS | | | |
| Real Property | | | $0.00 |
| Cash | | | $502.00 |
| Litigation Proceeds | | | Unknown |
| Total | | | $2,000.00 |
| | | | |
| LESS | | | $502.00 |
| Chapter 7 Trustee Fees | $500 | ($500) | $2.00 |
| Chapter 11 Admin Claims | $80,000.00 | ($2.00) | $0 |
| Property Tax Claims | $47,673.48 | $0 | $0 |
| Unsecured Claims | $270,000.00 | $0 | $0 |

## VIII. CONFIRMATION PROCEDURE

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

### A. VOTING AND OTHER PROCEDURES

A Ballot for the acceptance or rejection of the Plan is enclosed with the Disclosure Statement submitted to the Holders of Claims that are entitled to vote to accept or reject the Plan.

Each Holder of a Claim or interest in Classes 1 through 6 shall be entitled to vote to accept or reject the Plan. Pursuant to the provisions of the Bankruptcy Code, only Holders of Claims or interests in Classes that are impaired under the terms and provisions of a chapter 11 plan and are to receive Distributions thereunder are entitled to vote to accept or reject the plan. Classes of Claims or interests in which the Holders of Claims and interests will not receive or retain any property under a chapter 11 plan are deemed to have rejected the plan and are not entitled to vote to accept or reject the plan. Classes of Claims or interests in which the Holders of Claims or interests are unimpaired under a Chapter 11 plan, are deemed to have accepted the plan and not entitled to vote to accept or reject the plan.

The Bankruptcy Code defines "acceptance" of a plan by a Class of: (i) Claims, as acceptance by Creditors actually voting in that Class that hold at least two-thirds in dollar amount and more than one-half in number of the Claims; and (ii) Interests, as acceptance by interest Holders in that Class actually voting that hold at least two-thirds in number of ownership shares of the common stock of a debtor.

A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such acceptance or rejection was not solicited or procured in good faith or otherwise in accordance with the provisions of the Bankruptcy Code.

With respect to the Plan, any Holder of a Claim in an Impaired Class (i) whose Claim has been listed by the Debtor in the Schedules filed with the Bankruptcy Court (provided that such Claim has not been scheduled as Disputed, contingent or unliquidated), or (ii) who filed a proof of Claim on or before the applicable bar date (or, if not filed by such date, any proof of Claim filed within any other applicable period of limitations or with leave of the Bankruptcy Court), which Claim has not been disallowed and is not the subject of an objection, is entitled to vote. Holders of Claims that are Disputed, contingent and/or unliquidated are entitled to vote their Claims only to the extent that such Claims are Allowed for the purpose of voting pursuant to an order of the Bankruptcy Court. The Debtor may seek a determination that any Class of Claims that is entitled to vote to accept or reject the Debtor's Plan that does not vote to accept or reject the Debtor's Plan be deemed to accept the Plan, as applicable.

After carefully reviewing this Disclosure Statement, including any exhibits, each Holder of an Allowed Claim entitled to vote may vote whether to accept or reject the Debtor's Plan. A Ballot for voting on the Plan accompanies this Disclosure Statement. If you hold a Claim in more than one Class and you are entitled to vote Claims in more than one Class, you may receive a Ballot or Ballots, which will permit you to vote in all appropriate Classes of Claims. Please vote and return your Ballot to The Derbes Law Firm, LLC as follows, whether by U.S. mail, or by hand delivery or courier service:

The Derbes Law Firm, LLC
Attn: Patrick S. Garrity
3027 Ridgelake Dr.
Metairie, LA 70002

ANY EXECUTED BALLOT THAT FAILS TO INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED. BALLOTS RETURNED TO THE DERBES LAW FIRM, LLC BY FACSIMILE TRANSMISSION OR ANY OTHER ELECTRONIC MEANS WILL NOT BE COUNTED.

APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN. ALL CREDITORS THAT ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN.

**Ballots must be *received* by The Derbes Law Firm, LLC by the Voting Deadline.** If a Ballot is received after the voting deadline established by the Court, it will not be counted. Complete the Ballot by providing all the information requested, and sign, date and return the Ballot by mail, overnight courier or personal delivery to The Derbes Law Firm, LLC at the address set forth above.

TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED NO LATER THAN THE TIME AND DATE SET FORTH IN THE ACCOMPANYING NOTICE. ANY OBJECTIONS TO THE

CONFIRMATION OF THE PLAN MUST BE FILED IN ACCORDANCE WITH AND NO LATER THAN THE TIME AND DATE SET FORTH IN THE ACCOMPANYING NOTICE.

If you are entitled to vote on the Plan and you did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning the procedures for voting on the Plan, please telephone Patrick S. Garrity at the following telephone number: **1-504-837-1230**.

## B. DISCLAIMERS AND ENDORSEMENTS

Holders of Claims are urged to study the text of the Plan carefully to determine the impact of the Plan on their Claims and to consult with their financial, tax and legal advisors.

Nothing contained in this Plan will be deemed an admission or statement against interest that can be used against the Debtor in any pending or future litigation. Any reference to Creditors or Claims in this Plan is not an admission with respect to the existence, ownership, validity, priority, or extent of any alleged Lien, Claim, or encumbrance.

Certain statements and assertions in this Disclosure Statement may be subject to dispute by parties in interest.

## C. THE CONFIRMATION HEARING

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a Confirmation Hearing with respect to the Plan. The Confirmation Hearing in respect of the Plan has been scheduled for the date and time set forth in the accompanying notice before the Honorable **Meredith S. Grabill**, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Eastern District of Louisiana, on August 5, 2025. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice other than an announcement of the adjourned date made at the Confirmation Hearing or posted at the courthouse at the Confirmation Hearing or at an adjournment thereof. Any objection to Confirmation (i) must be made in writing, (ii) must specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim or a description of the interest in the Debtor held by the objector, and (iii) must be timely made. Any such objections must be filed with the Bankruptcy Court and served so that they are received by the Bankruptcy Court, and the following counsel, on or before the date and time set forth in the accompanying notice:

Counsel to the Debtor:
The Derbes Law Firm, LLC
Patrick S. Garrity
3027 Ridgelake Dr.
Metairie, LA 70002
Telephone: (504) 837-1230
Facsimile: (504) 684-5507

### D. CONFIRMATION

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan if the requirements of Section 1129 of the Bankruptcy Code are met. Among the requirements for Confirmation of a plan are that the plan is (i) accepted by all Impaired Classes of Claims or, if rejected by an Impaired Class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, (ii) feasible, and (iii) in the "best interests" of Creditors that are Impaired under the Plan.

### E. UNFAIR DISCRIMINATION AND FAIR AND EQUITABLE TESTS

Under the Bankruptcy Code, a plan does not have to be accepted by every Class of Creditors or interest Holders to be confirmed. If a class of claims or interests rejects a plan or is deemed to reject a plan, the plan proponent has the right to request confirmation of the plan pursuant to Section 1129(b) of the Bankruptcy Code the so-called "cramdown" provision of the Bankruptcy Code. Section 1129(b) permits the confirmation of a plan notwithstanding the non-acceptance of such plan by one or more impaired classes of claims and interests. Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class and meets the other legal criteria for confirmation.

In the event that any Class of Claims fails to accept the Plan in accordance with section 1129(a)(8) of the Bankruptcy Code, the Debtor (a) requests that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code.

Accordingly, to obtain nonconsensual confirmation of the Plan, it must be demonstrated to the Bankruptcy Court that the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Impaired, non-accepting Class. The Bankruptcy Code provides a nonexclusive definition of the phrase "fair and equitable." The Bankruptcy Code establishes "cram down" tests for Classes of Secured Claims, Unsecured Claims and Interests that do not accept the plan, as follows:

### 1. Secured Creditors

Either (a) each Impaired secured creditor retains the Liens securing its Secured Claim and receives on account of its Secured Claim deferred cash payments (x) totaling at least the Allowed Amount of the Secured Claim and (y) having a present value at least equal to the value of the secured creditor's collateral, (b) each Impaired secured creditor realizes the "indubitable equivalent" of its Allowed Secured Claim, or (c) the property securing the Claim is sold free and clear of Liens with the secured creditor's Lien to attach to the proceeds of the sale and such Lien on proceeds is treated in accordance with clause (a) or (b) of this subparagraph.

### 2. Unsecured Creditors

Either (a) each Impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its Allowed Claim, or (b) the holders of Claims and Interests that

are junior to the Claims of the dissenting Class will not receive any property under the plan, and the "best interest" test is met so that each Impaired unsecured creditor recovers at least what that creditor would receive if the case was converted to a chapter 7 case.

### 3. No Unfair Discrimination

In addition, the "cram down" standards of the Bankruptcy Code prohibit "unfair discrimination" with respect to the claims of any impaired, non-accepting class. While the "unfair discrimination" determination depends upon the particular facts of a case and the nature of the claims at issue, in general, courts have interpreted the standard to mean that the impaired, non-accepting class must receive treatment under a plan of reorganization which allocates value to such class in a manner that is consistent with the treatment given to other classes with claims against the Debtor of equal or junior status.

All Classes of creditors will receive Distributions under the Plan; thus, no Class of Creditors is conclusively presumed to have rejected the Plan. The Debtor believes that the treatment of all Classes of Claims under the Plan satisfies the "no unfair discrimination" requirement for nonconsensual confirmation of the Plan under section 1129(b) of the Bankruptcy Code. With respect to each such Impaired, non-accepting Class, there is no Class of equal priority receiving more favorable treatment under the Plan, and no Class that is junior to such Impaired, non-accepting Class will receive or retain any property under the Plan on account of the Claims in such Class.

### F. FEASIBILITY

The Bankruptcy Code requires that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization unless the liquidation of the Debtor is provided for in the plan. The Debtor believes the Plan is feasible and has attached hereto a pro forma forecast of operations to illustrate feasibility.

### G. BEST INTEREST TEST

In order to confirm a plan of reorganization, the Bankruptcy Court must determine that the plan is in the best interests of all classes of creditors and equity security holders impaired under that plan. The "best interest" test requires that the Bankruptcy Court find that the plan provides to each member of each impaired class of claims and interests (unless each such member has accepted the plan) a recovery which has a value at least equal to the value of the distribution that each creditor or interest holder would receive if the Debtor's assets were liquidated under chapter 7 of the Bankruptcy Code.

All Classes of Creditors will receive Distributions under the Plan; thus, no Class of Creditors is conclusively presumed to have rejected the Plan. The Debtor requests confirmation of the Plan over the rejection of any Classes. In so doing, the Debtor seeks to establish that the Plan complies with the best interest of Creditors test with respect to any such Class or Classes and satisfy all other legal criteria for Confirmation.

As reflected in the discussion above, and as demonstrated in the Liquidation Analysis contained in this Disclosure Statement, the Debtor believes that the Plan provides to each Holder of a Claim and Interest Holder a value at least equal to the value of the Distribution that each Holder would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code.

## H. CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN (AND ANY DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE), BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND THE IMPLEMENTATION OF THE PLAN.

The major risk factor is that the Debtor will be unable to lease sufficient space to meet its obligations under the Plan during the six (6) months after the Distribution Date.  This can occur in the event of unforeseen natural or market events that would damage the property and reduce its value.

## I. CERTAIN BANKRUPTCY CONSIDERATIONS

### 1. Risk of Liquidation of the Debtor's Estate.

If the Plan is not confirmed and consummated, there can be no assurance that the Debtor's Chapter 11 case will continue as a chapter 11 case rather than be converted to liquidation. If a Chapter 7 liquidation were to occur, the distributions to certain holders of Allowed Claims may be reduced, or possibly completely eliminated. In a liquidation under chapter 7, additional administrative claims will be incurred and could impact distributions to certain creditors.  As a result of these circumstances, the Debtor believes that the Plan provides a significantly higher return to holders of Claims, as compared to liquidation under Chapter 7.

### 2. Risk of Non-Occurrence of the Effective Date.

In the event that the conditions specified in the Plan have not been satisfied on or before 45 days after the Confirmation Date, then without an order of the Bankruptcy Court: (a) this Plan shall be null and void in all respects; (b) any settlement of Claims or Interests provided for hereby shall be null and void without further order of the Bankruptcy Court; and (c) the time within which the Debtor may assume and assign or reject all executory contracts and unexpired leases shall be extended for a period of sixty (60) days after such date.

### 3. Uncertainty Regarding Objections to Claims.

The Plan provides that certain objections to Claims can be filed with the Bankruptcy Court after the Effective Date. A Creditor may not know that its Claim will be objected to until after the Effective Date.

**4. Performance of Obligations by the Debtor under the Plan.**

The Debtor's ability to make the payments and Distributions required under the Plan depends upon leasing its real property and adequate income in the future that generates sufficient available cash flow to pay all operational expenses and to make the payments and Distributions required under the Plan. Despite the pro forma projections of the Debtor, which it believes accurately predicts that such cash flow will be available, there can be no assurance that these forward-looking statements will ultimately be correct.

## IX. RETENTION OF JURISDICTION

Under Sections 105(a) and 1142, and notwithstanding this Plan's Confirmation and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of or related to the Bankruptcy Case and this Plan, to the fullest extent permitted by law, including jurisdiction to:

a) hear and determine any and all objections to the allowance of Claims or Existing Equity Interests;

b) hear and determine any and all motions to estimate Claims at any time, regardless of whether the Claim to be estimated is the subject of a pending objection, a pending appeal, or otherwise;

c) hear and determine any and all motions to subordinate Claims or Existing Equity Interests at any time and on any basis permitted by applicable law;

d) hear and determine all Administrative Expense Claims;

e) hear and determine all matters with respect to the assumption or rejection of any executory contract or unexpired lease to which a Debtor is a party or with respect to which a Debtor may be liable, including, if necessary, the nature or amount of any Claim or required Cure Cost or the liquidation of any Claims arising therefrom;

f) hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to, the Chapter 11 Case;

g) enter such orders as may be necessary or appropriate in aid of the Consummation hereof and to execute, implement, or consummate the provisions hereof and all contracts, instruments, releases, and other agreements or documents created in connection with this Plan, the Disclosure Statement, or the Confirmation Order;

h) hear and determine disputes arising in connection with the interpretation, implementation, Consummation, or enforcement of this Plan and all contracts, instruments, and other agreements executed in connection with this Plan;

i) hear and determine any request to modify this Plan or to cure any defect or omission or reconcile any inconsistency herein or any order of the Bankruptcy Court;

j) issue and enforce injunctions or other orders, or take any other action that may be necessary or appropriate to restrain any interference with or compel action for the implementation, Consummation, or enforcement hereof or the Confirmation Order;

k) enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

l) hear and determine any matters arising in connection with or relating hereto, the

Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with this Plan, the Disclosure Statement, or the Confirmation Order;

m) enforce all orders, judgments, injunctions, releases, exculpation, indemnification, and rulings entered in connection with the Chapter 11 Case;

n) recover all assets of the Debtor and property of the Estate, wherever located;

o) hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505, and 1146;

p) issue such orders in aid of execution of this Plan to the extent authorized by Section 1142;

q) hear and determine all disputes involving the existence, nature, or scope of the Debtor's discharge and any releases or exculpations under this Plan;

r) hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code;

s) any escrow or interpleader action in connection with the Mathes Brierre Judgment, and

t) enter a final decree closing the Bankruptcy Case.

# X. MISCELLANEOUS PROVISIONS

## A. HEADINGS; DESCRIPTIONS.

The foregoing descriptions are for informational purposes only and are not an admission by, nor prejudice the rights of, the Debtor and/or the Reorganized Debtor, in all respects. Moreover, the descriptions contained herein and in any schedule provided in connection with this Plan are not exclusive. The inclusion or exclusion of any actions herein or on any such schedule is in no way a waiver of any claim or Cause of Action whatsoever and all such claims or Causes of Action are reserved and preserved. As of the date hereof, no determination has been made as to whether to pursue any such potential claims or Causes of Action.

## B. TAX REPORTING REQUIREMENTS.

Each Holder of an Allowed Claim that is to receive a Distribution under this Plan will have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such Distribution.

## C. NO TRANSFER TAX.

Pursuant to Section 1146(a), the following will not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, sales or use tax, mortgage tax, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment: (a) the issuance, transfer, exchange or conversion of the New Equity Interests; (b) the creation of any mortgage, deed of trust, lien or other security interest

under or pursuant to this Plan; (c) any Restructuring Transaction; or (d) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with this Plan, including any merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale or assignments executed in connection with any of the foregoing or pursuant to this Plan.

### D. SECTION 1145 EXEMPTION.

On and after the Effective Date, each of the Debtor and the Reorganized Debtor are authorized to and will provide, distribute, or issue, as applicable, the New Equity Interests and any and all other instruments, certificates, and other documents or agreements required to be provided, distributed, issued, executed or delivered pursuant to or in connection with the Plan (collectively, the "Plan Securities and Documents"), in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. The issuance of the Plan Securities and Documents and the distribution in each case thereof under the Plan will be exempt from registration under applicable securities laws (including Section 5 of the Securities Act or any similar state law requiring the registration for offer or sale of a security or registration or licensing of an issuer of a security) pursuant to section 1145(a) of the Bankruptcy Code, Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder and/or other applicable exemptions. Any Plan Securities and Documents, or other consideration that could be considered securities, to be issued pursuant to the Plan will be issued in reliance upon either section (4)(a)(2) of the Securities Act or Regulation D promulgated thereunder and will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom. Accordingly, the Plan Securities and Documents may be subject to restrictions on transfer under applicable law or as set forth in the governing documents to such Plan Securities and Documents. In addition, however, pursuant to Section 1145, the Plan Securities and Documents may be freely tradable in the U.S. by the recipients thereof, subject to (i) the provisions of Section 1145(b)(1) relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, (ii) compliance with applicable securities laws and any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments, and (iii) the laws and any rules and regulations of any State or federal agency or commission that may restrict or condition the trading of securities of a non- public company.

### E. EXPEDITED TAX DETERMINATION.

The Reorganized Debtor is authorized under this Plan to request an expedited determination of taxes under Section 505(b) of the Bankruptcy Code for any or all returns filed for, or on behalf of, the Debtor for any and all taxable periods (or portions thereof) ending after the Petition Date through and including the Effective Date.

### F. INCONSISTENT TERMS; CONTROLLING DOCUMENT.

In the event of an inconsistency between the terms of the Confirmation Order or this Plan with the Disclosure Statement, or any other agreement entered into between or among the

Debtor and any third party, this Plan shall control.

## G. SEVERABILITY OF PLAN PROVISIONS.

If, prior to Confirmation, any term or provision hereof is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtor, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions hereof shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision hereof, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

## H. SUCCESSORS AND ASSIGNS.

The rights, benefits and obligations of all Entities named or referred to herein shall be binding on, and shall inure to the benefit of, their respective heirs, executors, administrators, personal representatives, successors or assigns.

## I. BINDING EFFECT.

Upon the occurrence of the Effective Date, this Plan shall be binding upon and inure to the benefit of the Reorganized Debtor, all present and former Holders of Claims against and Equity Interests in the Debtors, their respective successors and assigns, including the Reorganized Debtors, all other parties-in- interest in the Bankruptcy Case (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

## J. REVOCATION, WITHDRAWAL, OR NON-CONSUMMATION.

The Debtor reserves the right, to revoke or withdraw this Plan at any time prior to the Confirmation Date and to file other plans of reorganization. If the Debtor revokes or withdraw this Plan, or if Confirmation or Consummation hereof does not occur, then (a) this Plan shall be null and void in all respects, (b) any settlement or compromise embodied herein (including the fixing or limiting to an amount any Claim or Class of Claims), assumption or rejection of executory contracts or leases effected by this Plan, and any document or agreement executed pursuant to this Plan shall be deemed null and void, and (c) nothing contained herein, and no acts taken in preparation for Consummation hereof, shall (x) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Existing Equity Interests in, the Debtor or any other Entity, (y) prejudice in any manner the rights of the Debtor or any Entity in any further proceedings involving the Debtor, or (z) constitute an admission of any sort by the Debtor, or

any other Entity.

**K. NOTICES.**

All notices, requests and demands to or upon the Debtor, to be effective, shall be in writing (including by electronic mail transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by electronic mail transmission, when received and confirmed by return electronic mail transmission, addressed as follows:

If to the Debtor, addressed to:

Rise Management, LLC
3929 Tulane Ave.
Suite 200
New Orleans, LA 70119

with a copy to:

Patrick S. Garrity, Esq.
The Derbes Law Firm, LLC
3027 Ridgelake Drive
Metairie, LA 70002
pgarrity@derbeslaw.com

**L. GOVERNING LAW.**

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit to this Plan provides otherwise (in which case the governing law specified therein shall be applicable to such exhibit), the rights, duties, and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Louisiana without giving effect to its principles of conflict of laws, or, with respect to law applicable to real property, deeds of trust thereupon, mortgages thereupon, and other matters affecting real property, the law of the state in which the real property is located.

**M. PREPAYMENT.**

Except as otherwise provided herein or the Confirmation Order, the Debtor and Reorganized Debtor shall have the right to prepay, without penalty or premium, all or any portion of an Allowed Claim at any time; provided that any such prepayment shall not violate, or otherwise prejudice, the relative priorities and parities among the Classes of Claims.

**N. SECTION 1125(E) OF THE BANKRUPTCY CODE.**

As of the Confirmation Date, the Debtor shall be deemed to have solicited acceptances of

this Plan in good faith and in compliance with the Bankruptcy Code. As of the Confirmation Date, the Debtor and its Affiliates, agents, directors, managing partners, managers, officers, employees, investment bankers, financial advisors, attorneys, and other professionals shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of the Plan Securities and Plan Documents, and therefore are not, and on account of such offer, issuance and solicitation shall not be, liable at any time for the violation of any law, rule or regulation governing the solicitation of acceptances or rejections hereof, the offer and issuance of the New Equity Interests, or the distribution or dissemination of any information contained in the Plan, the Disclosure Statement, the Plan Supplement, and any and all related documents.

### O. EXHIBITS/SCHEDULES.

All exhibits and schedules to this Plan are incorporated into and are a part of this Plan as if set forth in full herein.

### P. ENTIRE AGREEMENT.

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

Dated: October 15, 2025                           FILED BY:

Rise Management, LLC

*/s/ Cullan Maumus*
Name: Cullan Maumus
as Member of MagNola Ventures, LLC
Manager, Rise Management, LLC

and

*/s/ Patrick S. Garrity*
PATRICK S. GARRITY (#23744)
FREDICK L. BUNOL (#29111)
THE DERBES LAW FIRM, LLC
3027 Ridgelake Drive
Metairie, LA 70002
Telephone: (504) 207-0920
Email: pgarrity@derbeslaw.com
*Attorneys for the Debtor*

**EXHIBITS**

1.  Definitions

2.  Scope of Work and Costs

3.  Funding of JBIT Guaranty

4.  Marketing Report

5.  Construction Photos

6.  Completion Photos

7.  Historical Rental Data and Current Rental Rates

8.  Lease Comparables

9.  Appraisal

10. Property Description

11. Pro Forma

12. Schedule of Leases

13. Preliminary HUD Closing Statement

## Exhibit 1

**Administrative Expense** means (a) any cost or expense of administration of the Reorganization Case incurred before the Effective Date and allowable under section 503(b) of the Bankruptcy Code and entitled to priority under section 507(a)(2) of the Bankruptcy Code including, without limitation, (i) any actual and necessary post-petition cost or expense of preserving the Estate or operating the businesses of the Debtor, (ii) any payment required to cure a default on an Assumed Contract, (iii) any post-petition cost, indebtedness, or contractual obligation duly and validly incurred or assumed by a Debtor in the ordinary course of its business, and (iv) compensation or reimbursement of expenses of professionals to the extent allowed by the Bankruptcy Court under sections 330(a) or 331 of the Bankruptcy Code and (b) any fee or charge assessed against the Estates under 28 U.S.C. § 1930.

**Administrative Expense Claim** means any right to payment constituting a cost or expense of administration of the Bankruptcy Cases allowed under and in accordance with, as applicable, Sections 330, 503(b), 507(a)(2) and 507(b) of the Bankruptcy Code, including, without limitation, (a) any actual and necessary costs and expenses of preserving the Bankruptcy Estates, (b) any actual and necessary costs and expenses of operating the Debtors' businesses, (c) any indebtedness or obligations incurred or assumed by the Debtors during the Bankruptcy Cases, and (d) any compensation for professional services rendered and reimbursement of expenses incurred, including, without limitation, any fees or charges assessed against the Bankruptcy Estates pursuant to 28 U.S.C. § 1930.

**Allowed** means, with reference to any Claim against the Debtors, (a) any Claim against any of the Debtors that has been listed by such Debtor in its Schedules (as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009) as liquidated in amount and not Disputed or contingent and for which no contrary proof of claim has been filed or no timely objection to allowance or request for estimation has been interposed; (b) any timely filed proof of claim either (i) as to which no objection has been or is interposed by the General Bar Date or Government Bar Date, as applicable, or such other applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules or the Bankruptcy Court as to which any such applicable period of limitation has expired or (ii) as to which any objection has been determined by a Final Order to the extent such objection is determined in favor of the respective Holder of such Claim; (c) any Claim expressly allowed by a Final Order or under this Plan; or (d) any Claim that is compromised, settled or otherwise resolved pursuant to a Final Order; provided, however, that Claims allowed solely for the purpose of voting to accept or reject this Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claim."

**Avoidance Actions** means all causes of action, claims, remedies, or rights that may be brought by or on behalf of the Debtors or the Reorganized Debtors, arising under chapter 5 of the Bankruptcy Code, including avoidable transfers under Sections 547 and 549 of the Bankruptcy Code ("Preferential Transfers"), and fraudulent transfers under 11 U.S.C. § 548 and applicable state law (including fraudulent transfers or fraudulent conveyances, collectively, "Fraudulent Transfers") and Section 544 of the Bankruptcy Code, or under any related state or federal statutes or common law, regardless whether such action has been commenced prior to the Effective Date.

**Ballot** means the form distributed to each Holder of an impaired Claim that is entitled to vote to accept or reject this Plan on which it is to be indicated acceptance or rejection of this Plan.

**Bankruptcy Code** means title 11 of the United States Code, as amended from time to time, as applicable to the Bankruptcy Cases.

**Bankruptcy Court** or **Court** means the United States Bankruptcy Court for the Eastern District of Louisiana, exercising jurisdiction over these Bankruptcy Cases and all adversary proceedings and contested matters therein, or any other court of the United States having jurisdiction over these Bankruptcy Cases.

**Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court pursuant to 28 U.S.C. § 2075, as amended from time to time, as applicable to the Bankruptcy Cases, and any Local Rules of Bankruptcy Court.

**BOA** shall mean Bank of America, N.A.

**BOA Loan Documents** means the notes, security agreements, mortgages, extensions, renewals, and any other documents evidencing the debt to BOA.

**Business Day** means any day other than a Saturday, Sunday, or any other day on which banking institutions in New York City, New York are required or authorized to close by law or executive order.

**Capital** means Capital Advisors.

**Capital Claim** is the total claim of Capital Advisors, $1,404,677.00

**Capital Secured Claim** is the portion of the Capital Claim subject to treatment in Class 3, $250,000.00

**Cash** means legal tender of the United States of America.

**Cause of Action** means all actions, causes of action, liabilities, obligations, rights, suits, damages, judgments, remedies, demands, setoffs, defenses, recoupments, cross claims, counterclaims, third-party claims, indemnity claims, contribution claims or any other claims or causes of action whatsoever, whether known or unknown, matured or unmatured, fixed or contingent, liquidated or unliquidated, Disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Case, including through the Effective Date. Causes of Action include Avoidance Actions.

**Chapter 11** means Chapter 11 of the Bankruptcy Code.

**Claim** has the meaning set forth in Section 101(5) of the Bankruptcy Code.

**Class** means the group or category of Holders of Claims or Existing Equity Interests which are classified by this Plan pursuant to Section 1122 of the Bankruptcy Code or pursuant to an order of the Bankruptcy Court.

**Collateral** means any property or interest in property of the Bankruptcy Estate of the Debtor subject to a valid and properly perfected Lien, charge, or other encumbrance to secure the payment or performance of a Claim, which Lien, charge or other encumbrance is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable state law; and (ii) any acts of guaranty of payment of such Claim.

**Confirmation** means the determination of the Bankruptcy Court, evidenced by the Confirmation Order, to confirm this Plan.

**Confirmation Date** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket.

**Confirmation Hearing** means the hearing conducted by the Bankruptcy Court pursuant to Section 1128(a) of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

**Confirmation Order** means the order or orders of the Bankruptcy Court confirming this Plan pursuant to Section 1129 of the Bankruptcy Code.

**Creditor** has the meaning as set forth in Section 101(10) of the Bankruptcy Code and is the Holder of one or more Claims.

**Debt** means liability on a Claim.

**Debtor** or **Rise Management** means Rise Management, LLC, a Louisiana limited liability company.

**Disclosure Statement** means the Disclosure Statement accompanying this Plan, including, without limitation, all exhibits, schedules, and attachments thereto, as the same may be amended, supplemented, or otherwise modified from time to time, as approved by the Bankruptcy Court pursuant to Section 1125 of the Bankruptcy Code.

**Disclosure Statement Order** means the order of the Bankruptcy Court approving, among other things, the Disclosure Statement and establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject this Plan.

**Disputed** means, with reference to any Administrative Expense Claim or Claim, any such Administrative Expense Claim or Claim (a) to the extent neither Allowed nor disallowed under this Plan or a Final Order nor deemed Allowed under Sections 502, 503 or 1111 of the Bankruptcy Code; (b) which has been or hereafter is listed by a Debtor on its Schedules as unliquidated,

Disputed or contingent and which has not been resolved by written agreement of the parties or a Final Order; or (c) as to which the Debtors or any other party in interest has interposed a timely objection and/or request for estimation in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules, which objection or request for estimation has not been withdrawn or determined by a Final Order. Prior to the earlier of the time an objection has been timely filed and the expiration of the time within which to object to such Claim set forth herein or otherwise established by order of the Bankruptcy Court, a Claim shall be considered Disputed to the extent that the amount of the Claim specified in a proof of claim exceeds the amount of the Claim scheduled by the Debtors as not disputed, contingent or unliquidated (but only to the extent of such excess portion).

**Disputed Claim Amount** means the amount set forth in the proof of claim or Schedules relating to a Claim that is Disputed or an amount estimated pursuant to an order of the Bankruptcy Court in respect of a Claim that is Disputed in accordance with Section 502(a) of the Bankruptcy Code and Bankruptcy Rule 3018.

**Distribution** means any distribution to the various Classes pursuant to the terms of this Plan.

**Distribution Date** means the 1st day of the month after the Effective Date.

**Effective Date or Effective Date of this Plan** means the date that is the first Business Day after the conditions to the effectiveness of this Plan specified in Article V, Section 2 hereof have been satisfied or waived.

**Entity** has the meaning set forth in Section 101(15) of the Bankruptcy Code.

**Estate** means the bankruptcy estate of the Debtor in this case pursuant to Section 541 of the Bankruptcy Code.

**Existing Equity Interest** means, without duplication, all membership interests of and in the Debtor, issued and outstanding immediately prior to the Effective Date, including, but not limited to, (a) all unexercised incentive stock or membership interest options, non-qualified stock or membership interest options, and stock or membership interest appreciation rights granted under any sponsored stock or membership interest option plans, (b) any other unexercised options, warrants, or rights, contractual or otherwise, if any, to acquire or receive an Equity Interest existing immediately before the Effective Date, and (c) all interests in the Debtor issued and held in treasury as of immediately before the Effective Date.

**Final Order** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reserved, vacated or stayed and as to which (a) the time to appeal or move for a new trial, re-argument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for a new trial, re-argument or rehearing shall then be pending; or (b) if an appeal, new trial, re-argument or rehearing thereof has been sought and a stay has been granted or a bond has been posted pursuant to applicable law, (i) such order or judgment shall have been affirmed by the highest court to

which such order was appealed, certiorari shall have been denied or a new trial, re-argument or rehearing shall have been denied or resulted in no modification of such order, and (ii) the time to take any further appeal, or move for a new trial, re-argument or rehearing shall have expired.

**General Bar Date** means November 20, 2024, fixed by the Bankruptcy Court pursuant to Bankruptcy Rule 3003(c)(3), is the deadline by which all Persons asserting Claims against the Debtors (other than Administrative Expense Claims) are required to file proofs of claim or be forever barred from asserting such Claims against the Debtor or their property and from voting on this Plan and/or sharing in any distributions hereunder.

**General Unsecured Claim** means any Claim for which no property of the Debtor or the Bankruptcy Estate serves as security or Collateral. It also consists of the Claims for unsecured debts, liabilities, and demands or any character whatsoever owed by the Debtor, including, without limitation, all Claims noted on the Schedules filed herein, all amendments hereto, and all Claims by Persons having actual and/or constructive notice or knowledge of these Bankruptcy Cases.

**General Unsecured Creditor** means the Holder of a General Unsecured Claim against the Debtor.

**Government Bar Date** means February 3, 2025, fixed by the Bankruptcy Court pursuant to Bankruptcy Rule 3003(c)(3), is the deadline by which all Governmental Units asserting Claims against the Debtor (other than Administrative Expense Claims) are required to file proofs of claim or be forever barred from asserting such Claims against the Debtors or their property and from voting on this Plan and/or sharing in any distributions hereunder.

**Government Unit** has the meaning set forth in Section 101(27) of the Bankruptcy Code.

**Holder** means the holder, as of the Distribution Record Date, of any Claim, including without limitation any one or more of Administrative Expense Claims, Priority Claims, or General Unsecured Claims.

**Impaired** means with respect to any Class of Claims or Existing Equity Interests under this Plan in which this Plan has altered the legal, equitable, and contractual rights of such Claims or Existing Equity Interests, and a Claim is Impaired unless it meets one of the exceptions specified in Section 1124 of the Bankruptcy Code.

**Insider** shall have the meaning set forth in Section 101(31) of the Bankruptcy Code.

**Insider Claims** means any Administrative Claims, Secured Claims or General Unsecured Claims held by any Insider.

**Insider Parties** means any Insider together with each of their respective present or former shareholders, members, officers, directors, managers, employees, successors, assigns, heirs, agents, advisors, attorneys, insiders, and professionals (each an Insider Party).

**IRC** means the Internal Revenue Code of 1986, as amended.

**JBIT** means the Janice Bruno Irrevocable Trust.

**Lien** has the meaning set forth in Section 101(37) of the Bankruptcy Code.

**Litigation Proceeds** means the funds generated from Avoidance Actions and the collection of amounts owed to the Debtor by third parties, after payment of all Allowed Administrative Expense Claims, Priority Claims and Priority Tax Claims.

**MagNola** means MagNola Ventures, LLC, the property manager of the Debtor.

**Person** has the meaning set forth in Section 101(41) of the Bankruptcy Code.

**Petition Date** means August 7, 2024, the date on which the Debtor filed its voluntary petition.

**Plan** means this Chapter 11 Plan of Reorganization of the Debtor, including, without limitation, the exhibits, and schedules hereto, as the same may be amended or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms hereof.

**Priority Claim** means a Claim entitled to priority in payment as specified in Sections 507(a)(1)-(10) of the Bankruptcy Code.

**Priority Tax Claim** means any Claim of a governmental unit of the kind entitled to priority in payment as specified in Sections 502(i) and 507(a)(8) of the Bankruptcy Code.

**Professional Fee Claim** means a Professional's Claim for compensation or reimbursement of costs and expenses under Sections 327, 328, 330, 331, 503(b) (other than 503(b)(4)) or 1103 for services rendered to the Debtors on and after the Petition Date but before and including the Effective Date.

**Pro Rata** means, with reference to any distribution on account of any Allowed Claim in any Class, a distribution equal in amount to the ratio (expressed as a percentage) that the amount of such Allowed Claim bears to the aggregate amount of Allowed Claims in such Class.

**Professional** means any Court-approved professional Person employed by the Debtor or the Unsecured Creditors Committee in the Bankruptcy Cases at any time before the Confirmation Date.

**Property of the Estate** is defined in Section 541 of the Bankruptcy Code.

**Rejection Claim** means any Claim arising out of the rejection of an executory contract or unexpired lease pursuant to Section 365 of the Bankruptcy Code. Allowed Rejection Claims are classified and as an unsecured claim in the Class of unsecured claims for the counterparty to the rejection claim.

**Rejection Claim Bar Date** means that date that is ten (10) days after the Confirmation Date.

**Reorganized Debtor** means the Debtor after the Effective Date, or any successor thereto by merger, consolidation or otherwise.

**Retained Causes of Action** means any Causes of Action specifically or implicitly preserved and retained under this Plan.

**Sale Proceeds** means the funds generated from the Liquidation of the Property, less any realtor fees and costs.

**Schedules** means, collectively, the schedules of assets and liabilities, schedules of executory contracts and unexpired leases and statements of financial affairs filed by the Debtors under Section 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and the Official Bankruptcy Forms in the Bankruptcy Case, as have been amended or supplemented through the Confirmation Date pursuant to Bankruptcy Rule 1007.

**Secured Claim** means any Claim that is secured by a Lien on Collateral.

**Secured Creditor** means those Creditors who possess valid and perfected Liens against any property of the Debtor.

**SOFR** shall mean the Secured Overnight Financing Rate, as published by the New York Federal Reserve on the Effective Date. For purposes of projections for this Disclosure Statement, SOFR is 4.29%.

**Tenant Deposit Claim** means any unsecured claim for a refund or partial refund of a deposit made with the Debtor in connection with the lease or rental of one or more units from the Debtor.

**Unliquidated Claim** means any Claim, the amount of liability for which has been not fixed, whether pursuant to agreement, applicable law or otherwise, as of the date on which such Claim is asserted or sought to bet estimated.

**Unsecured Claim** means any Claim that is not secured by a Lien on Collateral.

**Voting Class** means a Class specified as such in Article IV of this Plan.

Docusign Envelope ID: F58DAA4C-5099-4769-89C8-FDF64887F579

Exhibit 3

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: | * | Case No. 24-11535 |
| | * | |
| Rise Management, LLC | * | Chapter 11 |
| | * | |
| Debtor | * | Section A |

*********************************************

## DECLARATION OF JANICE BRUNO,
## TRUSTEE OF THE JANICE BRUNO IRREVOCABLE TRUST

**STATE OF FLORIDA**
**COUNTY OF**

I, JANICE BRUNO, hereby declare under penalty of perjury:

1.  I am the Co-Trustee of the Janice Bruno Irrevocable Trust ("Trust").

2.  The Trust owns five percent of the membership interests of Rise Management, LLC.

3.  I am over the age of 18, and I am authorized to submit this Declaration on behalf of the Trust.

4.  Rise Management, LLC ("Debtor") is a Louisiana limited liability company that is currently a debtor in the above-captioned bankruptcy case.

5.  To insure payment of the Debtor's obligations under a confirmed Chapter 11 plan in the first two years after confirmation, the Trust will guarantee payment of up to $200,000.00 of payments required under the plan during that period.

6.  The funds will be provided through line of credit from Capital Advisors, with such funds currently in a dedicated account for the Trust's use in this case.

7.  The Debtor has proposed an alternative treatment of the Bank Of America claim based on an additional equity infusion of $148,000.00 from the Trust. The funds for the equity infusion

Docusign Envelope ID: F58BAA4C-5099-4769-89C8-FDF64887F5F9

will be obtained from profits generated through the sale of property owned by a separate non-debtor entity in which the Trust has an ownership interest.

8.      The Debtor will not be responsible for repayment of any funds provided by the Trust in accordance with paragraphs 6 and 7, nor will any property of the Debtor be used as collateral for the guaranty.

9.      The Trust will execute any documents necessary to evidence this guarantee at least ten (10) days prior to the hearing.

10.     The Trust will execute any documents required by Capital Advisors, LLC to effectuate the line of credit.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  May ___, 2025

_____
Janice Bruno
Co-Trustee of the Janice Bruno Irrevocable Trust

PROPERTY OF CAPITAL ADVISORS, LLC – FOR AUTHORIZED RECIPIENTS ONLY

Upon confirmation of the Chapter 11 Plan of Rise Management, LLC, Capital Advisors will issue a credit line to the Janice Bruno Irrevocable Trust in the amount of $200,000.00 ("Credit Line").  Where Janice Bruno will be personally liable to guarantee the line of credit for the Irrevocable Trusts benefit. The Credit Line will be released by the cash contained in a dedicated account, as evidenced in the attached account statement dated April 29, 2025 from BFI Infinity, Inc  Janice Bruno and the Janice Bruno Irrevocable Trust must execute all required loan agreements before accessing the credit line.  Funds will be available to the Janice Bruno Irrevocable Trust within ten (10) days of entry of an order confirming the Chapter 11 Plan of Rise Management, LLC., which the line of credit must only be used for plan approved expenses and financial needs after which the debtor or ownership require the use of outside funding to execute the approved bankruptcy plan obligations.

ORA Directors

Capital Advisors, Authorized Agent





4/29/2025

**BFI**

## 1 Asset Overview 1/1/2025 - 4/29/2025

### Key Portfolio Information

| Reporting Currency | USD |
|---|---|
| Current NAV | 215,914 |
| Highest NAV | 220,219 |
| Date of Highest NAV | 1/1/2025 |
| Dividends | 0.00% |
| Coupons | 0.00% |
| Total Distributions | 0.00% |
| TWR Performance | -1.95% |
| Total Performance | -4,305 |

### Performance Development



— TWR

### Asset Exposure



| Type | Quota |
|---|---|
| Liquidity | 100.00% |
| Total | 100.00% |

### Currency Exposure



| NAV | Quota |
|---|---|
| USD | 100.00% |
| Total | 100.00% |

### Regional Exposure



| Region | Quota |
|---|---|
| Other | 100.00% |
| Total | 100.00% |

## 2 List of all Assets as of 4/29/2025



| Security | ISIN | Region | Industry | Allocation | Quantity | Purchase Price Sec. Curr. | Market Price Sec. Curr. | Market Price Date | NAV Start 1/1/2025 | NAV End 4/29/2025 | TWR YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Liquidity | - | - | - | 100.00% | - | - | - | - | 220,219 USD | 215,914 USD | -1.95% |
| Bank accounts | - | - | - | 100.00% | 215,913.99 | - | - | - | 220,219 USD | 215,914 USD | -1.95% |
| USD,CALL | - | - | - | 100.00% | 215,913.99 | - | - | - | 220,219 USD | 215,914 USD | -1.95% |
| Total | - | - | - | 100.00% | - | - | - | - | 220,219 USD | 215,914 USD | -1.95% |

**BFI**

## 3 Glossar & Disclaimer

**Glossary of Frequently Used Terms**

| | |
|---|---|
| Time Weighted Performance | The net compound rate of return over the evaluated period. Fees that are not related to the asset management, for example the insurance fees charged in a PPLI policy, are excluded from the calculation. |
| Asset Allocation | Overview of investments held in the portfolio, sorted by asset categories. |
| Deposits/Withdrawals | This section includes all partial liquidations, additional contributions whether these are cash or securities. Furthermore, it includes all insurance fees which may be charged by the insurance carrier during the selected period. Insurance fees include establishment fees and administration fees. |
| Sec. Curr. | Security Currency. The currency in which a security / asset is denominated and traded. |
| Rep. Curr. | Reporting Currency. The reference currency against which the performance of the portfolio is measured and reported in this statement. |
| Quantity / Nominal | The quantity (e.g. number of units) or the nominal value of securities / assets held in the portfolio. |
| Assets | The name of the asset held in the portfolio, including bonds, stocks, funds, but also non-bank assets like physical precious metals or real estate. |
| NAV | Net asset value. The value of an investment fund that is determined by subtracting its liabilities from its assets. |
| Interest/Dividends | Interest from bonds and other fixed income investments / Dividends from equity positions and funds. |
| Accrued Interest paid/received | The interest that has accumulated on a bond since the last interest payment. |
| Fees | Includes the Total asset management fees charged by the mandated asset manager during the selected period and the total custody and administration fees charged by the custodian bank during the selected period. |
| Gain/Loss | The investment returns, gains or losses, during the period. |

**Legal Disclaimer**

BFI assumes no responsibility for, nor does it certify the accuracy of the reported data. Although every attempt has been made to ensure the reliability of the data contained herein, some inaccuracies may exist. The report(s) are a supporting document for clients. The information provided has been generated on the basis of statements provided to us by the respective bank(s) as well as on the market data provider(s). The statements you receive directly from the respective custodian bank(s) are the official record for your account. Please compare and verify the information contained herein with the information on the custodian's statements you receive from the custodians/banks.

BFI uses LSEG or the custody bank as its market data provider. Security prices as well as FX prices can be different from prices that are being used from the custodians.



| | N 4/... | T P... si... 1/... | T si... 1/... | Q 4/... |
|---|---|---|---|---|
| Liqu... | 21... | -4,3... | -1.... | 10... |
| Total | 21... | -4,3... | -1.... | 10... |

**NAV** 
215,914 USD

**TWR**
-1.95% ↘

**Total Performance**
-4,305 USD ↘

Asset Overview    List of all Asse    🔍    Search...    01. Jan - 27. Apr 2025 📅 ◯

## Overview

### NAV Development    Performance Development



Asset Exposure    Currency Exposure    Regional Ex

Last updated: Apr 28, 2025, 10:05:56 PM ↻



**BFI** Capital Adv ▾   Asset Overview   List of all Asse 🔍   Search...   01. Jan - 27. Apr 2025 📅   ◯

NAV
**215,914 USD**

TWR
**-1.95%** ↘

Total Performance
**-4,305 USD** ↘

Overview

| | N... 4/... | T... P... si... 1/... | T... si... 1/... | Q... 4/... |
|---|---|---|---|---|
| > Liqu... | 21... | -4,3... | -1... | 10... |
| Total | 21... | -4,3... | -1... | 10... |

NAV Development   Performance Development



Asset Exposure   Currency Exposure   Regional Ex

Last updated: Apr 28, 2025, 10:05:56 PM ↻

**Rise Management, LLC**
*3361 General De Gaulle*

PROFORMA

| SCENARIO #2 | Aug-25 | Sep-25 | Oct-25 | Nov-25 | Dec-25 | Jan-26 | Feb-26 | Mar-26 | Apr-26 | May-26 | Jun-26 | Jul-26 | Year 1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Units** | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | |
| Total Leased Units | 5 | 8 | 10 | 11 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | |
| Occupancy Rate (%)* | 42% | 67% | 83% | 92% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| Occupancy Rate (SqFt) (%) | 47% | 71% | 81% | 95% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| Vacant Units | 7 | 4 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| * Based on Total Units | | | | | | | | | | | | | |
| **Beginning Cash Balance** | 2,711 | 3,688 | 21,473 | 28,082 | 38,125 | 49,621 | 239,138 | 249,111 | 260,934 | 269,741 | 269,421 | 271,710 | 2,711 |
| **OPERATING INCOME** | | | | | | | | | | | | | |
| Rental Income | | | | | | | | | | | | | |
| Gross Potential Rental Income | 7,995 | 11,089 | 12,155 | 13,968 | 14,559 | 14,559 | 14,559 | 14,559 | 14,559 | 14,559 | 14,559 | 14,559 | 161,667 |
| Vacancy | (160) | (222) | (243) | (279) | (291) | (291) | (291) | (291) | (291) | (291) | (291) | (291) | (3,233) |
| Delinquency/Bad Debt | | | | | | | | | | | | | |
| Total Rental Income | 7,835 | 10,868 | 11,912 | 13,679 | 14,267 | 14,267 | 14,267 | 14,267 | 14,267 | 14,267 | 14,267 | 14,267 | 158,433 |
| Reimbursable Expenses (NNN FEES) | 4,910 | 7,364 | 8,425 | 9,921 | 10,152 | 9,127 | 9,227 | 9,227 | 9,227 | 9,227 | 9,227 | 9,227 | 105,279 |
| **TOTAL OPERATING INCOME** | 12,745 | 18,251 | 20,337 | 23,599 | 24,419 | 23,394 | 23,494 | 23,494 | 23,494 | 23,494 | 23,494 | 23,494 | 263,712 |
| **OPERATING EXPENSES** | | | | | | | | | | | | | |
| Maintenance & Contract Services | | | | | | | | | | | | | |
| Common Area Maintenance | 150 | 150 | 150 | 150 | 150 | 150 | 250 | 250 | 250 | 250 | 250 | 250 | 2,400 |
| Contract/Svcs - Plumbing | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contract/Svcs - HVAC | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contract/Svcs - Landscaping | 150 | 150 | 150 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 3,300 |
| Contract/Svcs - Janitorial (Common Area) | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 1,200 |
| **TOTAL MAINTENANCE & CONTRACT SERVICES** | 400 | 400 | 400 | 550 | 550 | 550 | 650 | 650 | 650 | 650 | 650 | 650 | 6,900 |
| Insurance | | | | | | | | | | | | | |
| Property Insurance - FIRE/HAZARD | 1,243 | 1,243 | 1,243 | 1,243 | 1,243 | 1,243 | 1,243 | 1,243 | 1,243 | 1,243 | 1,243 | 1,243 | 14,916 |
| Property Insurance - WIND | 1,368 | 1,368 | 1,368 | 1,368 | 1,368 | 1,368 | 1,368 | 1,368 | 1,368 | 1,368 | 1,368 | 1,368 | 16,416 |
| Flood | 172 | 172 | 172 | 172 | 172 | 172 | 172 | 172 | 172 | 172 | 172 | 172 | 2,664 |
| General Liability Insurance | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **TOTAL INSURANCE** | 2,783 | 2,783 | 2,783 | 2,783 | 2,783 | 2,783 | 2,783 | 2,783 | 2,783 | 2,783 | 2,783 | 2,783 | 33,396 |
| Management Fees | | | | | | | | | | | | | |
| Company Mgt Fee | 392 | 543 | 596 | 664 | 713 | 713 | 713 | 713 | 713 | 713 | 713 | 713 | 7,922 |
| Property Management Fee | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 15,000 |
| **TOTAL MANAGEMENT FEES** | 1,642 | 1,793 | 1,846 | 1,934 | 1,963 | 1,963 | 1,963 | 1,963 | 1,963 | 1,963 | 1,963 | 1,963 | 22,922 |
| Taxes | | | | | | | | | | | | | |
| Property Tax - New Orleans | 3,072 | 3,072 | 3,072 | 3,072 | 3,072 | 2,047 | 2,047 | 2,047 | 2,047 | 2,047 | 2,047 | 2,047 | 29,687 |
| **TOTAL TAXES** | 3,072 | 3,072 | 3,072 | 3,072 | 3,072 | 2,047 | 2,047 | 2,047 | 2,047 | 2,047 | 2,047 | 2,047 | 29,687 |
| Utilities | | | | | | | | | | | | | |
| Cable / Internet / Telephone | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Trash | 130 | 130 | 130 | 130 | 130 | 130 | 130 | 130 | 130 | 130 | 130 | 130 | 1,560 |
| Water & Sewer | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 14,000 |
| Electricity - Home Meters | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 2,900 |
| **TOTAL UTILITIES** | 1,680 | 1,680 | 1,680 | 1,680 | 1,680 | 1,680 | 1,680 | 1,680 | 1,680 | 1,680 | 1,680 | 1,680 | 19,280 |
| Non-Reimbursable Expenses | | | | | | | | | | | | | |
| Electricity - Vacant Units | 1,600 | 600 | 400 | 300 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 2,900 |
| Other | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 1,200 |
| **TOTAL NON-REIMBURSABLE EXPENSES** | 1,700 | 700 | 500 | 400 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 4,100 |
| **TOTAL OPERATING EXPENSES** | 10,376 | 10,426 | 10,430 | 10,418 | 10,143 | 9,123 | 9,223 | 9,223 | 9,223 | 9,223 | 9,223 | 9,223 | 115,604 |
| **NET OPERATING INCOME** | 2,369 | 7,824 | 9,907 | 13,161 | 14,271 | 14,271 | 14,271 | 14,271 | 14,271 | 14,271 | 14,271 | 14,271 | 147,443 |
| CAPEX | (997) | (2,478) | (2,253) | (2,344) | (1,981) | (2,653) | (2,128) | (1,981) | (3,044) | (2,421) | (1,515) | (3,044) | (26,438) |
| COMMISSIONS | - | 13,233 | - | - | - | - | - | - | - | - | - | - | 13,233 |
| COLLECTIONS | - | - | - | - | - | 93,700 | - | - | - | - | - | - | 93,700 |
| Settlement Funds - Payoff Admin & Priority Claims | - | - | - | - | - | 178,150 | - | - | - | - | - | - | 178,150 |
| Settlement Funds to Debtor (50% after Admin/Priority) | - | - | - | - | - | 178,150 | - | - | - | - | - | - | 178,150 |
| **TOTAL** | (697) | 10,755 | 7,824 | | | | | | | | | | 258,646 |

**Rise Management, LLC**
*3361 General De Gaulle*

PROFORMA

| SCENARIO #2 - Plan Payments | Aug-25 | Sep-25 | Oct-25 | Nov-25 | Dec-25 | Jan-26 | Feb-26 | Mar-26 | Apr-26 | May-26 | Jun-26 | Jul-26 | Year 1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Administrative Claims (Legal Settlement funds pay off)** | | | | | | | | | | | | | |
| Attorney Fees | - | - | - | - | - | (40,000) | - | - | - | - | - | - | (40,000) |
| Accounting Fees | - | - | - | - | - | (10,000) | - | - | - | - | - | - | (10,000) |
| Appraisal Fees | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Administrative Claims** | - | - | - | - | - | (50,000) | - | - | - | - | - | - | (50,000) |
| **Other Chptr 11 Costs** | | | | | | | | | | | | | |
| U.S. Trustee Fees | - | - | (250) | - | - | (250) | - | - | (250) | - | - | (250) | (1,000) |
| **Total Other Chptr 11 Costs** | - | - | (250) | - | - | (250) | - | - | (250) | - | - | (250) | (1,000) |
| **Priority and Unsecured Claims** | | | | | | | | | | | | | |
| Priority Claims (Legal Settlement funds pay off) | (795) | (795) | (795) | (795) | (795) | - | - | - | - | - | - | - | (3,973) |
| Unsecured Claims (Class 5) | - | - | - | - | - | (43,700) | - | - | - | - | - | - | (43,700) |
| **Total Unsecured Claims** | (795) | (795) | (795) | (795) | (795) | (43,700) | - | - | - | - | - | - | (47,673) |
| **Secured Claims** | | | | | | | | | | | | | |
| NIP - Bank of America (Class 2) | (148,000) | - | - | - | - | - | - | - | - | - | - | - | (148,000) |
| Capital Advisors (Class 3) | - | - | - | - | - | - | (2,170) | (2,170) | (2,170) | (2,170) | (2,170) | (2,170) | (13,020) |
| Property Tax Claims (Class 4) | - | - | - | - | - | - | - | (8,297) | - | - | (8,297) | - | (16,594) |
| **Total Secured Claims** | (148,000) | - | - | - | - | - | (2,170) | (10,467) | (2,170) | (2,170) | (10,467) | (2,170) | (177,614) |
| **Net Cashflow** | 977 | 17,784 | 6,610 | 10,043 | 11,496 | 189,517 | 9,973 | 1,823 | 8,807 | 9,680 | 2,289 | 8,807 | 129,806 |
| **Ending Cash Balance (Pre-funding)** | 3,688 | 21,473 | 28,082 | 38,125 | 49,621 | 239,138 | 249,111 | 250,934 | 259,741 | 269,421 | 271,710 | 280,517 | 132,517 |
| Equity Infusion | 148,000 | - | - | - | - | - | - | - | - | - | - | - | 148,000 |
| Print to BofA from Equity | (148,000) | - | - | - | - | - | - | - | - | - | - | - | |
| **Ending Cash Balance** | 3,688 | 21,473 | 28,082 | 38,125 | 49,621 | 239,138 | 249,111 | 250,934 | 259,741 | 269,421 | 271,710 | 280,517 | 280,517 |

# Rise Management, LLC
*3361 General De Gaulle*

PROFORMA

**SCENARIO #2**

| | Aug-26 | Sep-26 | Oct-26 | Nov-26 | Dec-26 | Jan-27 | Feb-27 | Mar-27 | Apr-27 | May-27 | Jun-27 | Jul-27 | Year 2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Units** | | | | | | | | | | | | | |
| Total Leased Units | | | | | | | | | | | | | |
| Occupancy Rate (%)* | | | | | | | | | | | | | |
| Occupancy Rate (SqFt) (%) | | | | | | | | | | | | | |
| Vacant Units | | | | | | | | | | | | | |
| * Based on Total Units | | | | | | | | | | | | | |
| **Beginning Cash Balance** | 280,517 | 289,443 | 290,393 | 291,606 | 301,704 | 301,624 | 294,810 | 296,352 | 297,895 | 291,081 | 292,623 | 294,166 | 280,517 |
| **OPERATING INCOME** | | | | | | | | | | | | | |
| Rental Income | | | | | | | | | | | | | |
| Gross Lease | | | | | | | | | | | | | |
| Gross Potential Rental Income | 14,995 | 14,995 | 14,995 | 14,995 | 14,995 | 14,995 | 14,995 | 14,995 | 14,995 | 14,995 | 14,995 | 14,995 | 179,945 |
| Vacancy | (900) | (900) | (900) | (900) | (900) | (900) | (900) | (900) | (900) | (900) | (900) | (900) | (10,797) |
| Delinquency/Bad Debt | (225) | (225) | (225) | (225) | (225) | (225) | (225) | (225) | (225) | (225) | (225) | (225) | (2,699) |
| Total Rental Income | 13,871 | 13,871 | 13,871 | 13,871 | 13,871 | 13,871 | 13,871 | 13,871 | 13,871 | 13,871 | 13,871 | 13,871 | 166,449 |
| Reimbursable Expenses (NNN FEES) | 8,756 | 8,756 | 8,756 | 8,756 | 8,756 | 8,756 | 8,756 | 8,756 | 8,756 | 8,756 | 8,756 | 8,756 | 105,073 |
| **TOTAL OPERATING INCOME** | 22,627 | 22,627 | 22,627 | 22,627 | 22,627 | 22,627 | 22,627 | 22,627 | 22,627 | 22,627 | 22,627 | 22,627 | 271,522 |
| **OPERATING EXPENSES** | | | | | | | | | | | | | |
| Maintenance & Contract Services | | | | | | | | | | | | | |
| Common Area Maintenance | 258 | 258 | 258 | 258 | 258 | 258 | 258 | 258 | 258 | 258 | 258 | 258 | 3,090 |
| ContractSvcs - Plumbing | - | - | - | - | - | - | - | - | - | - | - | - | - |
| ContractSvcs - HVAC | - | - | - | - | - | - | - | - | - | - | - | - | - |
| ContractSvcs - Landscaping | 309 | 309 | 309 | 309 | 309 | 309 | 309 | 309 | 309 | 309 | 309 | 309 | 3,708 |
| ContractSvcs - Janitorial (Common Area) | 103 | 103 | 103 | 103 | 103 | 103 | 103 | 103 | 103 | 103 | 103 | 103 | 1,236 |
| TOTAL MAINTENANCE & CONTRACT SERVICES | 670 | 670 | 670 | 670 | 670 | 670 | 670 | 670 | 670 | 670 | 670 | 670 | 8,034 |
| Insurance | | | | | | | | | | | | | |
| Property Insurance - FIRE/HAZARD | 1,380 | 1,380 | 1,380 | 1,380 | 1,380 | 1,380 | 1,380 | 1,380 | 1,380 | 1,380 | 1,380 | 1,380 | 16,557 |
| Property Insurance - WIND | 1,409 | 1,409 | 1,409 | 1,409 | 1,409 | 1,409 | 1,409 | 1,409 | 1,409 | 1,409 | 1,409 | 1,409 | 16,904 |
| Tenant Liability Insurance | 177 | 177 | 177 | 177 | 177 | 177 | 177 | 177 | 177 | 177 | 177 | 177 | 2,126 |
| TOTAL INSURANCE | 2,966 | 2,966 | 2,966 | 2,966 | 2,966 | 2,966 | 2,966 | 2,966 | 2,966 | 2,966 | 2,966 | 2,966 | 35,591 |
| Management Fees | | | | | | | | | | | | | |
| Company Mgt Fee | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 15,000 |
| Property Management Fee | 694 | 694 | 694 | 694 | 694 | 694 | 694 | 694 | 694 | 694 | 694 | 694 | 8,322 |
| TOTAL MANAGEMENT FEES | 1,944 | 1,944 | 1,944 | 1,944 | 1,944 | 1,944 | 1,944 | 1,944 | 1,944 | 1,944 | 1,944 | 1,944 | 23,322 |
| Taxes | | | | | | | | | | | | | |
| Property Tax - New Orleans | 2,047 | 2,047 | 2,047 | 2,047 | 2,047 | 2,108 | 2,108 | 2,108 | 2,108 | 2,108 | 2,108 | 2,108 | 24,994 |
| TOTAL TAXES | 2,047 | 2,047 | 2,047 | 2,047 | 2,047 | 2,108 | 2,108 | 2,108 | 2,108 | 2,108 | 2,108 | 2,108 | 24,994 |
| Utilities | | | | | | | | | | | | | |
| Cable / Internet Telephone | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Trash | 134 | 134 | 134 | 134 | 134 | 134 | 134 | 134 | 134 | 134 | 134 | 134 | 1,607 |
| Water & Sewer | 1,270 | 1,270 | 1,270 | 1,270 | 1,270 | 1,270 | 1,270 | 1,270 | 1,270 | 1,270 | 1,270 | 1,270 | 15,244 |
| Electricity - Home Meters | 249 | 249 | 249 | 249 | 249 | 249 | 249 | 249 | 249 | 249 | 249 | 249 | 2,984 |
| TOTAL UTILITIES | 1,653 | 1,653 | 1,653 | 1,653 | 1,653 | 1,653 | 1,653 | 1,653 | 1,653 | 1,653 | 1,653 | 1,653 | 19,838 |
| Non-Reimbursable Expenses | | | | | | | | | | | | | |
| Electricity - Vacant Units | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 247 |
| Other | 103 | 103 | 103 | 103 | 103 | 103 | 103 | 103 | 103 | 103 | 103 | 103 | 1,236 |
| TOTAL NON-REIMBURSABLE EXPENSES | 124 | 124 | 124 | 124 | 124 | 124 | 124 | 124 | 124 | 124 | 124 | 124 | 1,483 |
| **TOTAL OPERATING EXPENSES** | 9,403 | 9,403 | 9,403 | 9,403 | 9,403 | 9,464 | 9,464 | 9,464 | 9,464 | 9,464 | 9,464 | 9,464 | 113,242 |
| **NET OPERATING INCOME** | 13,224 | 13,224 | 13,224 | 13,224 | 13,224 | 13,163 | 13,163 | 13,163 | 13,163 | 13,163 | 13,163 | 13,163 | 158,280 |
| CAPEX | - | - | - | - | - | - | - | - | - | - | - | - | - |
| COMMISSIONS | - | - | - | - | - | - | - | - | - | - | - | - | - |
| COLLECTIONS | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Settlement Funds - Payoff Admin & Priority Claims | (2,128) | (1,808) | (1,484) | (995) | - | - | - | - | - | - | - | - | (6,376) |
| Settlement Funds to Debtor (50% after Admin/Prio | | | | | | | | | | | | | |
| **TOTAL** | (2,128) | (1,808) | (1,484) | (995) | - | - | - | - | - | - | - | - | (6,376) |

**Rise Management, LLC**
*3361 General De Gaulle*

PROFORMA

| SCENARIO #2 - Plan Payments | Aug-26 | Sep-26 | Oct-26 | Nov-26 | Dec-26 | Jan-27 | Feb-27 | Mar-27 | Apr-27 | May-27 | Jun-27 | Jul-27 | Year 2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Administrative Claims (Legal Settlement funds pay)** | | | | | | | | | | | | | |
| Attorney Fees | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Accounting Fees | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Appraisal Fees | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Administrative Claims** | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | | | |
| **Other Chptr 11 Costs** | | | | | | | | | | | | | |
| U.S. Trustee Fees | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Other Chptr 11 Costs** | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | | | |
| **Priority and Unsecured Claims** | | | | | | | | | | | | | |
| Priority Claims (Legal Settlement funds pay off) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Unsecured Claims (Class 5) | - | - | (8,357) | - | - | (8,357) | - | - | (8,357) | - | - | (8,357) | (33,428) |
| **Total Unsecured Claims** | - | - | (8,357) | - | - | (8,357) | - | - | (8,357) | - | - | (8,357) | (33,428) |
| | | | | | | | | | | | | | |
| **Secured Claims** | | | | | | | | | | | | | |
| NiP - Bank of America (Class 2) | - | - | - | - | (2,837) | (9,450) | (9,450) | (9,450) | (9,450) | (9,450) | (9,450) | (9,450) | (68,987) |
| Capital Advisors (Class 3) | (2,170) | (2,170) | (2,170) | (2,170) | (2,170) | (2,170) | (2,170) | (2,170) | (2,170) | (2,170) | (2,170) | (2,170) | (26,040) |
| Property Tax Claims (Class 4) | - | (8,297) | - | - | (8,297) | - | - | - | - | - | - | - | (16,594) |
| **Total Secured Claims** | (2,170) | (10,467) | (2,170) | (2,170) | (13,304) | (11,620) | (11,620) | (11,620) | (11,620) | (11,620) | (11,620) | (11,620) | (111,621) |
| | | | | | | | | | | | | | |
| **Net Cashflow** | 8,926 | 949 | 1,213 | 10,098 | (80) | (6,814) | 1,543 | 1,543 | (6,814) | 1,543 | 1,543 | (6,814) | 6,835 |
| **Ending Cash Balance (Pre-funding)** | 289,443 | 290,393 | 291,606 | 301,704 | 301,624 | 294,810 | 296,352 | 297,895 | 291,081 | 292,623 | 294,166 | 287,352 | 287,352 |
| Equity Infusion | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Print to BofA from Equity | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Ending Cash Balance** | 289,443 | 290,393 | 291,606 | 301,704 | 301,624 | 294,810 | 296,352 | 297,895 | 291,081 | 292,623 | 294,166 | 287,352 | 287,352 |

**Rise Management, LLC**
*3361 General De Gaulle*

PROFORMA

| SCENARIO #2 | Aug-27 | Sep-27 | Oct-27 | Nov-27 | Dec-27 | Jan-28 | Feb-28 | Mar-28 | Apr-28 | May-28 | Jun-28 | Jul-28 | Year 3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash Balance | 287,352 | 289,352 | 291,353 | 284,997 | 286,997 | 288,998 | 282,578 | 284,515 | 286,453 | 280,033 | 281,970 | 283,908 | 287,352 |
| **Total Units** | | | | | | | | | | | | | |
| Total Leased Units | | | | | | | | | | | | | |
| Occupancy Rate (%)¹ | | | | | | | | | | | | | |
| Occupancy Rate (SqFt) (%)¹ | | | | | | | | | | | | | |
| Vacant Units | | | | | | | | | | | | | |
| * Based on Total Units | | | | | | | | | | | | | |
| **OPERATING INCOME** | | | | | | | | | | | | | |
| Rental Income | | | | | | | | | | | | | |
| Gross Lease | | | | | | | | | | | | | |
| Gross Potential Rental Income | 15,445 | 15,445 | 15,445 | 15,445 | 15,445 | 15,445 | 15,445 | 15,445 | 15,445 | 15,445 | 15,445 | 15,445 | 185,343 |
| Vacancy | (927) | (927) | (927) | (927) | (927) | (927) | (927) | (927) | (927) | (927) | (927) | (927) | (11,121) |
| Delinquency/Bad Debt | (232) | (232) | (232) | (232) | (232) | (232) | (232) | (232) | (232) | (232) | (232) | (232) | (2,780) |
| Total Rental Income | 14,287 | 14,287 | 14,287 | 14,287 | 14,287 | 14,287 | 14,287 | 14,287 | 14,287 | 14,287 | 14,287 | 14,287 | 171,443 |
| Reimbursable Expenses (NNN FEES) | 9,022 | 9,022 | 9,022 | 9,022 | 9,022 | 9,022 | 9,022 | 9,022 | 9,022 | 9,022 | 9,022 | 9,022 | 108,266 |
| **TOTAL OPERATING INCOME** | 23,309 | 23,309 | 23,309 | 23,309 | 23,309 | 23,309 | 23,309 | 23,309 | 23,309 | 23,309 | 23,309 | 23,309 | 279,711 |
| **OPERATING EXPENSES** | | | | | | | | | | | | | |
| Maintenance & Contract Services | | | | | | | | | | | | | |
| Common Area Maintenance | 265 | 265 | 265 | 265 | 265 | 265 | 265 | 265 | 265 | 265 | 265 | 265 | 3,183 |
| Contract Svcs - Plumbing | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contract Svcs - HVAC | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contract Svcs - Landscaping | 318 | 318 | 318 | 318 | 318 | 318 | 318 | 318 | 318 | 318 | 318 | 318 | 3,819 |
| Contract Svcs - Janitorial (Common Area) | 106 | 106 | 106 | 106 | 106 | 106 | 106 | 106 | 106 | 106 | 106 | 106 | 1,273 |
| TOTAL MAINTENANCE & CONTRACT SERVICES | 690 | 690 | 690 | 690 | 690 | 690 | 690 | 690 | 690 | 690 | 690 | 690 | 8,275 |
| Insurance | | | | | | | | | | | | | |
| Property Insurance - FIRE/HAZARD | 1,463 | 1,463 | 1,463 | 1,463 | 1,463 | 1,463 | 1,463 | 1,463 | 1,463 | 1,463 | 1,463 | 1,463 | 17,550 |
| Property Insurance - WIND | 1,451 | 1,451 | 1,451 | 1,451 | 1,451 | 1,451 | 1,451 | 1,451 | 1,451 | 1,451 | 1,451 | 1,451 | 17,416 |
| General Liability Insurance | 182 | 182 | 182 | 182 | 182 | 182 | 182 | 182 | 182 | 182 | 182 | 182 | 2,190 |
| TOTAL INSURANCE | 3,096 | 3,096 | 3,096 | 3,096 | 3,096 | 3,096 | 3,096 | 3,096 | 3,096 | 3,096 | 3,096 | 3,096 | 37,156 |
| Management Fees | | | | | | | | | | | | | |
| Company Mgt Fee | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 15,000 |
| Property Management Fee | 714 | 714 | 714 | 714 | 714 | 714 | 714 | 714 | 714 | 714 | 714 | 714 | 8,572 |
| TOTAL MANAGEMENT FEES | 1,964 | 1,964 | 1,964 | 1,964 | 1,964 | 1,964 | 1,964 | 1,964 | 1,964 | 1,964 | 1,964 | 1,964 | 23,572 |
| Taxes | | | | | | | | | | | | | |
| Property Tax - New Orleans | 2,108 | 2,108 | 2,108 | 2,108 | 2,108 | 2,172 | 2,172 | 2,172 | 2,172 | 2,172 | 2,172 | 2,172 | 25,744 |
| TOTAL TAXES | 2,108 | 2,108 | 2,108 | 2,108 | 2,108 | 2,172 | 2,172 | 2,172 | 2,172 | 2,172 | 2,172 | 2,172 | 25,744 |
| Utilities | | | | | | | | | | | | | |
| Cable / Internet / Telephone | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Trash | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 1,655 |
| Water & Sewer | 1,308 | 1,308 | 1,308 | 1,308 | 1,308 | 1,308 | 1,308 | 1,308 | 1,308 | 1,308 | 1,308 | 1,308 | 15,701 |
| Electricity - Home Meters | 256 | 256 | 256 | 256 | 256 | 256 | 256 | 256 | 256 | 256 | 256 | 256 | 3,077 |
| TOTAL UTILITIES | 1,703 | 1,703 | 1,703 | 1,703 | 1,703 | 1,703 | 1,703 | 1,703 | 1,703 | 1,703 | 1,703 | 1,703 | 20,433 |
| Non-Reimbursable Expenses | | | | | | | | | | | | | |
| Electricity - Vacant Units | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 255 |
| Other | 106 | 106 | 106 | 106 | 106 | 106 | 106 | 106 | 106 | 106 | 106 | 106 | 1,273 |
| TOTAL NON-REIMBURSABLE EXPENSES | 127 | 127 | 127 | 127 | 127 | 127 | 127 | 127 | 127 | 127 | 127 | 127 | 1,528 |
| **TOTAL OPERATING EXPENSES** | 9,689 | 9,689 | 9,689 | 9,689 | 9,689 | 9,762 | 9,762 | 9,762 | 9,762 | 9,762 | 9,762 | 9,762 | 116,717 |
| **NET OPERATING INCOME** | 13,621 | 13,621 | 13,621 | 13,621 | 13,621 | 13,557 | 13,557 | 13,557 | 13,557 | 13,557 | 13,557 | 13,557 | 163,004 |
| CAPEX | | | | | | | | | | | | | |
| COMMISSIONS | | | | | | | | | | | | | |
| COLLECTIONS | | | | | | | | | | | | | |
| Settlement Funds - Payoff Admin & Priority Claims | | | | | | | | | | | | | |
| Settlement Funds to Debtor (50% after Admin/Prio) | | | | | | | | | | | | | |
| **TOTAL** | | | | | | | | | | | | | |

**Rise Management, LLC**

*3361 General De Gaulle*

PROFORMA

| SCENARIO #2 - Plan Payments | Aug-27 | Sep-27 | Oct-27 | Nov-27 | Dec-27 | Jan-28 | Feb-28 | Mar-28 | Apr-28 | May-28 | Jun-28 | Jul-28 | Year 3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Administrative Claims (Legal Settlement funds pay** | | | | | | | | | | | | | |
| Attorney Fees | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Accounting Fees | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Appraisal Fees | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Administrative Claims** | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Other Chptr 11 Costs** | | | | | | | | | | | | | |
| U.S. Trustee Fees | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Other Chptr 11 Costs** | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Priority and Unsecured Claims** | | | | | | | | | | | | | |
| Priority Claims (Legal Settlement funds pay off) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Unsecured Claims (Class 5) | - | - | (8,357) | - | - | (8,357) | - | - | (8,357) | - | - | (8,357) | (33,428) |
| **Total Unsecured Claims** | - | - | (8,357) | - | - | (8,357) | - | - | (8,357) | - | - | (8,357) | (33,428) |
| **Secured Claims** | | | | | | | | | | | | | |
| NIP - Bank of America (Class 2) | (9,450) | (9,450) | (9,450) | (9,450) | (9,450) | (9,450) | (9,450) | (9,450) | (9,450) | (9,450) | (9,450) | (9,450) | (113,400) |
| Capital Advisors (Class 3) | (2,170) | (2,170) | (2,170) | (2,170) | (2,170) | (2,170) | (2,170) | (2,170) | (2,170) | (2,170) | (2,170) | (2,170) | (26,040) |
| Property Tax Claims (Class 4) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Secured Claims** | (11,620) | (11,620) | (11,620) | (11,620) | (11,620) | (11,620) | (11,620) | (11,620) | (11,620) | (11,620) | (11,620) | (11,620) | (139,440) |
| **Net Cashflow** | 2,001 | 2,001 | (6,356) | 2,001 | 2,001 | (6,420) | 1,937 | 1,937 | (6,420) | 1,937 | 1,937 | (6,420) | (9,864) |
| **Ending Cash Balance (Pre-funding)** | 289,352 | 291,353 | 284,997 | 286,997 | 288,998 | 282,578 | 284,515 | 286,453 | 280,033 | 281,970 | 283,908 | 277,488 | 277,488 |
| **Equity Infusion** | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Pmt to BofA from Equity** | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Ending Cash Balance** | 289,352 | 291,353 | 284,997 | 286,997 | 288,998 | 282,578 | 284,515 | 286,453 | 280,033 | 281,970 | 283,908 | 277,488 | 277,488 |